UNITED STATES, Appellee

v.

JOHN D. STRINGER, Sergeant, U. S. Army, Appellant

5 USCMA 122, 17 CMR 122

No. 4071

Decided November 19, 1954

Lt Col James C. Hamilton, U. S. Army, Capt William C. Irby, Jr., U. S. Army, 1st Lt Alexander J. Jemal, Jr., U. S. Army, and 1st Lt Jackson L. Kiser, U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, and 1st Lt Benjamin C. Flannagan, U. S. Army, for Appellee.

## Opinion of the Court

Paul W. Brosman, Judge:

A general court-martial convened at La Rochelle, France, on May 1, 1953, found the accused, Stringer, guilty of stealing 24,000 francs from Mrs. Jeanne Ecale, a French National, in violation of the Uniform Code of Military Justice, Article 121, 50 USC § 715. The court sentenced him to receive a dishonorable discharge, to total forfeitures of pay and allowances, and to confinement at hard labor for one year. Both the findings and the sentence were approved by the convening authority and affirmed thereafter by a board of review. We granted the accused's petition for review to determine (1) whether his plea of former jeopardy had been properly overruled at the trial, and (2) whether the law officer erred in admitting over defense objection the deposition of Mrs. Ecale, the victim of the alleged larceny.

II

The accused's plea stemmed from the circumstance that on April 24, 1953, he had been brought to trial before another court on the identical charge and specification. At that time, the prosecution—stumbling forward with the presentation of its case—offered in evidence the deposition of Mrs. Ecale for the purpose of establishing

a corpus delicti for the introduction of statements by the accused. A Private Lee was called to testify to certain somewhat inconclusive admissions made by the accused following the alleged larceny. At the close of the examination of this witness by trial and defense counsel, the second-ranking member of the court, a Lieutenant Colonel Sellers, began to question him. The understandable dissatisfaction of court members with the conduct of the case was suggested by a colloquy held near the end of Colonel Sellers' interrogation:

"LAW OFFICER: I hate to interfere with the court's questioning, but I don't see the relation as to whether he knew anyone there or not.

"LT. COL. SELLERS: The evidence which has been produced so far is so inconcise and confused—

"LAW OFFICER: I am sorry, you are not prosecuting the case."

Thereafter, Private Lee completed his testimony and the prosecution announced that its next witness would be a Sergeant Atkinson. Before the Sergeant made his entry, the court's president provoked the following exchange:

"PRESIDENT: . . . Apparently this case is not ready for trial. Under the old Manual I would know what we could have done, but I don't know now.

"LAW OFFICER: You say this case should not be brought to trial at this time?

"PRESIDENT: I don't think that justice can be done. We are here to hear a case, and if this is a sample of what we are going to have to hear, I think the case will have to be better prepared. *Otherwise, we will hang the man innocently.*

"LAW OFFICER: I wish to point out that the question of hanging a man before there is sufficient evidence is highly improper at this time.

"PRESIDENT: The wording is probably incorrect, but nevertheless, to this moment—

"LAW OFFICER: It is not, sir, the duty of the court or the law officer nor the defense counsel to prepare a case. It is the responsibility of the

prosecution, and if the evidence is insufficient, then you have but one alternative, and that is to acquit him." [Emphasis supplied.]

Following a recess, Sergeant Atkinson testified for the prosecution to the effect that the accused had confessed to him that he had stolen 24,000 francs from a French woman. The written confession was introduced in evidence, and the court adjourned for the day. On reconvention the next morning, trial counsel presented a letter from the convening authority, which recited the remarks of the court's president, pronounced them "highly prejudicial to both the Government and the accused," and directed a withdrawal of the charges and a reference to a new court. To this withdrawal the defense counsel objected strenuously. Of course, he reasserted that objection by way of plea in bar when the accused was brought before the second court-martial.

### III

The Uniform Code—in its Article 44, 50 USC § 619—reiterates the command of Article of War 40, 10 USC § 1511, that "No person shall, without his consent, be tried a second time for the same offense." Article 44(c) adds that:

"A proceeding which, subsequent to the introduction of evidence but prior to a finding, is dismissed or terminated by the convening authority or on motion of the prosecution for failure of available evidence or witnesses without any fault of the accused shall be a trial in the sense of this article."

Quite clearly, the legislative intendment of this provision was to forbid retrial of an accused when the prosecution had failed to prepare its case properly and thereafter sought to have the charges withdrawn prior to findings for the purpose of presenting a more persuasive one before another court. See, e.g., Hearings before the Senate Committee on Armed Services, 81st Congress, 1st session, on S 857 and HR 4080, pages 323 and 324; Hearings before the House Committee on Armed Services, 81st Congress, 1st session, on

HR 2498, pages 671, 802; Cornero v. United States, 48 F2d 69 (CA 9th Cir). In the words of Professor E. M. Morgan, Jr., Chairman of the Forrestal Committee, fairness to an accused requires that a prosecutor "shoot his bolt all at once." Senate Hearings, supra. The Manual for Courts-Martial, United States, 1951, proceeds in the same tenor and enjoins:

". . . The power to withdraw a case after evidence has been taken on the issue of guilt or innocence will be exercised only with the greatest caution, under urgent circumstances, and for very plain and obvious causes. A specification will not be withdrawn arbitrarily or unfairly to the accused in any case. When a specification is withdrawn after evidence has been taken on the issue of guilt or innocence, the reasons therefor shall be stated in the record of trial." [Paragraph 56b.]

However, the Manual also provides that "withdrawal of a specification because of manifest necessity in the interest of justice is not a bar to further prosecution." By way of illustration it adds:

". . . Thus, if urgent and unforeseen military necessity requires that a trial be terminated, and it does not appear that the military situation will permit resumption of the trial within a reasonable time, the withdrawal of a specification will not prevent a later trial for the same offense. Similarly, if inadmissible information, highly prejudicial to either the Government or the accused, has been brought to the attention of the court, and it appears to the convening authority that the members of the court cannot be reasonably expected to remain uninfluenced thereby, he may withdraw the case from that court and refer it to another court." [Idem.; see also paragraph 68d.]

The wording of these provisions concerning the withdrawal of charges by a convening authority makes ▆▆▆▆ ▆ it apparent that the Manual's draftsmen intended to adopt the Federal rule relating to the

**128**

circumstances under which jeopardy attaches following the presentation of evidence. Cf. Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, pages 63, 88. A foundation case for that rule is United States v. Perez, 9 Wheat 579, 6 L ed 165. The defendant there was being tried for a capital offense, and the jury —unable to agree on a verdict—was discharged by the judge without the consent of the defendant or the attorney for the United States. The defendant's contention that further trial for the offense was barred was rejected by the Supreme Court which stated:

". . . We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a *manifest necessity* for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the judges, under their oaths of office." [Emphasis supplied.]

In Thompson v. United States, 155 US 271, 39 L ed 146, 15 S Ct 73, the Supreme Court cited Perez and two subsequent cases—Simmons v. United States, 142 US 148, 35 L ed 968, 12 S Ct 171, and Logan v. United States, 144 US 263, 36 L ed 429, 12 S Ct 617— for the proposition that:

". . . Those cases clearly established the law of this court that courts

of justice are invested with the authority to discharge a jury from giving any verdict whenever, in their opinion, taking all the circumstances into consideration, there is *manifest necessity* for the act, or the ends of public justice would otherwise be defeated, and to order a trial by another jury; and that the defendant is not thereby twice put in jeopardy, within the meaning of the fifth amendment to the constitution of the United States." [Emphasis supplied.]

The doctrine of "manifest necessity" was applied in a military setting in Wade v. Hunter, 336 US 684, 93 L ed 974, 69 S Ct 754. Wade had been brought to trial originally in March 1945 at Pfalzfeld, Germany, before a court-martial on a charge of rape. All of the evidence offered by the Government and the defense was in and the court-martial had closed to deliberate. Subsequently a continuance was announced in order that the trial judge advocate might secure other witnesses whom the members of the court wished to hear. Thereafter, the troops of the convening authority advanced farther into Germany, and thus left to their rear the residences of the witnesses in the case. Accordingly, the charges were withdrawn from the first court and the case was transferred to another command believed to be in a more favorable position to try the case. That command referred the serious charge to a second court-martial before whose members the accused interposed a plea of double jeopardy. The plea was overruled by the court—and, the Supreme Court held, properly so. The Court quoted extensively from the Perez case and asserted:

". . . And there have been instances where a trial judge has discovered facts during a trial which indicated that one or more members of a jury might be biased against the Government or the defendant. It is settled that the duty of the judge in this event is to discharge the jury and direct a retrial. What has been said is enough to show that a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments."

In a recent opinion discussing a claim that a state court had deprived the defendant of the "due process" required by the Fourteenth Amendment, the Supreme Court reaffirmed the doctrine of Perez and Wade v. Hunter to the effect that there exists "discretion in the trial judge to declare a mistrial and to require another panel to try the defendant if the ends of justice will be best served." Brock v. North Carolina, 344 US 424, 97 L ed 456, 73 S Ct 349.

Wade v. Hunter was decided during the course of hearings on the Uniform Code of Military Justice. On several occasions the case was brought to the attention of the two Congressional committees concerned, and the problem of double jeopardy was discussed and analyzed. House Hearings, supra, pages 669–671, 801, 1048–1051; Senate Hearings, supra, pages 168–170, 323–325. While criticism was heard concerning the narrowness of the former jeopardy doctrine—as some commentators conceived it to exist under Article of War 40—no inclination was exhibited to accord the serviceman greater protection than that granted his civilian counterpart under the principle of "manifest necessity." See House Hearings, supra, pages 669–671, 1047; Senate Hearings, supra, pages 167–168, 186, 323–325. Accordingly, it would seem that Congress left the framers of the Manual quite free to adopt for courts-martial—as they did—the rules of former jeopardy developed and applied in the Federal civilian courts.

## IV

Under our analysis, then, a trial by court-martial may be terminated prior to findings by reason of "manifest necessity" without the attachment of jeopardy. In a civilian court such a termination would be produced through the declaration of a mistrial or some similar action by the trial judge. Who is able to take this action in the instance of a court-martial proceeding? Traditionally, it has been the convening au-

thority—indeed, he alone—who has been invested with power to end a trial by court-martial prior to findings. Although, the Congressional Committees considering the proposed Uniform Code were distinctly made aware of this circumstance in connection with detailed discussions of Wade v. Hunter, supra—in which a convening authority had withdrawn charges from a military court—no sort of doubt was expressed that the authority to conclude a trial because of "manifest necessity" should reside in this functionary. Moreover, the Code itself in Article 44(c) impliedly recognizes the power of the convening authority to intervene in a proceeding after the presentation of evidence, but prior to findings. The Manual for Courts-Martial too—contemporaneously applying Congressional intent—recognizes this authority to repose in the convening authority. Paragraph 56.

To be sure, it may be contended that a motion for a mistrial is, in civilian practice, addressed solely to the discretion of the trial judge, and is of no concern to an appellate agency. Accordingly, it is said that, since the law officer—rather than the convening authority—is the military analogue of the trial judge, he and only he should exercise the power to terminate a court-martial proceeding prior to findings. Thus, there would be no authorization for the convening authority himself to withdraw charges.

While all of the members of this Court recognize that, in general, the law officer must be deemed the court-martial's "judge," it is undeniable that in some respects Congress *did* create a different role for him—whether we like it or not. Unlike the civilian judge, he may be overruled by members of the court-martial with respect to a holding on a motion for findings of not guilty. Article 51(b). Also, unlike the civilian judge, he is not permitted to sentence the convicted accused. Article 52. And so on. The present setting is simply another in which one must conclude that Congress has varied for the military the rules which operate in civilian procedure to prevent the declaration of a mistrial by appellate authority.

Several reasons for the Congressional determination in this respect may be surmised. For one thing, the convening authority is apt to be in a relatively better position to ascertain whether, by reason of administrative or military factors, there is "manifest necessity" for the withdrawal of charges. Such military factors are, of course, to be found at the core of Wade v. Hunter, supra. Moreover, Congress may well have believed that inherently the parallelism between civilian and military law administration could not be complete as to mistrials. The civilian trial judge who declares a mistrial is not required to invoke the aid of an appellate agency to impanel a new jury and re-open the proceedings. Contrariwise, if charges are withdrawn from a court-martial, they cannot be brought before another tribunal without the participation of the convening authority in the form of an order re-referring the charges. Since the convening authority must thus enter the picture in any event, Congress may have thought it appropriate to permit him initially to withdraw charges under pressing circumstances. Perhaps, too, it was considered that, if the convening authority noted during the progress of the trial the presence of errors which would lead to disapproval by him of findings of guilty—apart, of course, from insufficiency of the Government's evidence—he should be allowed to terminate the proceeding instanter. Admittedly, such a doctrine would deprive the accused of the benefits of a situation in which he might win, but could not lose. However, the possibility of this deprivation might conceivably have left the Congress undisturbed. Perhaps, too, the Code did no less than perpetuate unselectively a former rule of law without regard to the new status of the law officer. Regardless of the reasons therefor, we are sure the rule is clear that the convening authority does possess the power to withdraw charges when "manifest necessity" intervenes.

If the convening authority possesses the power to withdraw charges, may the

law officer also exercise this authority? As previously emphasized, ■■■■■■ ■ we have analogized the law officer to the civilian judge, who does possess the power in question. Moreover, one colloquy during the House consideration on the Uniform Code has been believed to indicate that the law officer possesses the authority to withdraw charges:

"MR. LARKIN. It is absolutely binding, except for the fact of course that any member of the court whether he is a lawyer or otherwise may for his own personal reason not follow them, which is a situation that obtains in any court in the land. The judge may rule on the questions of law and he may instruct the jury and charge them and as it happens the jury goes out and pays no attention to them whatever. But that is something over which no one has any control in any tribunal.

"MR. DE GRAFFENRIED. He acts as the judge on questions of law?

"MR. LARKIN. That is right. He acts as an outright judge on questions of law and his rulings are final and binding. Whether any individual person decides that he doesn't want to follow them or not of course is a different problem.

"MR. BROOKS. It is just binding in reference to interlocutory decisions, isn't it?

"MR. LARKIN. And it is binding on his instructions, before they retire, as to the elements of the offense and on the other law of the case, if necessary.

"MR. DURHAM. He would still have the right to rule on a *mistrial,* wouldn't he?

"MR. LARKIN. That is right; he has the right. On a motion for a dismissal or a motion for acquittal he has the right to rule, but in that case as in the case of insanity his ruling is subject to veto by the court." [Emphasis supplied.] [House Hearings, supra, page 1154.]

All of the members of this Court appear to agree generally on the desirability of a rule which would permit the law officer to declare a mistrial. However, the author of the present opinion must confess to substantial misgivings concerning the legislative authorization for this result. One circumstance suggesting these doubts is the fact that all of the Armed Services have ruled consistently that a court-martial, or any element thereof, is without power to declare a mistrial, and that the motion for a mistrial is unknown to military law. See, e.g., United States v. Conway [NCM 228], 11 CMR 625; United States v. Beale [CGCMS 19655], 7 CMR 469; United States v. Simpson [ACM 3430], 4 CMR(AF) 256; United States v. Collins [ACM 2104] 2 CMR (AF) 699; United States v. Stevenson, 45 BR 267, 284. The absence of a clear showing that Congress intended to alter this long-established rule is especially significant, since the attention of its members was specifically directed to the problem of withdrawal of charges.

The reference to "mistrial" at the Hearings is somewhat the less convincing by reason of the circumstance that Congressman Durham—who used the word—is not an attorney by profession, and may not have been speaking of the term in its technical sense. In addition, Mr. Larkin's quoted response to the Durham inquiry would certainly suggest that the question was interpreted by him as referring to something other than a mistrial in the lawyer's sense. Furthermore, in view of our conclusion that the convening authority does possess the power to withdraw charges, there is perhaps some reason to believe that the law officer does not do so—since divided authority within the same sphere is ordinarily abhorred by lawmakers. And finally, the circumstance that a civilian court possesses continuity and is able to reopen proceedings following a mistrial —whereas in military law the convening authority must necessarily intervene for the purpose of referring the case to a new court-martial—might imply that Congress wished the entire matter to rest exclusively in the hands of the convening authority. However, since my brothers are convinced that the law officer *does* possess the power to declare a mistrial, this ruling must be regarded as constituting the law of the Court.

## V

Irrespective of who may withdraw charges from consideration by a court-martial, it seems clear that ■ this action does not require a request by, or even the consent of, the accused. Indeed, in Perez v. United States, supra—the leading case on former jeopardy—the mistrial was declared wholly without the defendant's consent. Accord: Gardes v. United States, 87 Fed 172 (CA 5th Cir) cert den 171 US 689, 43 L ed 1179, 19 S Ct 884. Subsequent cases make manifest that, when a free and fair hearing cannot be had, a mistrial should be declared, *even in the face of objection by the accused*—and that no provision of the Constitution in such circumstances will serve to prevent a further and a better trial. Thompson v. United States, supra; Sanford v. Robbins, 115 F2d 435 (CA5th Cir); Himmelfarb v. United States, 175 F2d 924 (CA9th Cir), cert den, 338 US 860, 94 L ed 527, 70 S Ct 103, (containing a comprehensive collection of authorities); United States v. Giles, 19 F Supp 1009 (WD Okla). Cf. State v. Ravencraft, 222 SC 139, 71 SE2d 798; Mack v. Commonwealth, 177 Va 921, 15 SE2d 62; Commonwealth v. Cronin, 257 Mass 535, 154 NE 176; State v. Slorah, 118 Me 203, 106 Atl 768.

The convening authority here rested his withdrawal on the ground that the president's remark was ■ prejudicial both to "the ■ Government and the accused." However, the decision of the board of review centers almost exclusively on the possibility that the remark materially prejudiced the accused. While—as mentioned—charges may properly be withdrawn from a court-martial over the objection of the accused, it would be difficult to sustain action of this nature solely on the ground that it was taken to protect *him* from prejudice. Such a protection, tendered an accused who protests vehemently against it, savors too strongly of paternalism—and especially so when, as here, the questioned remark of the president indicated to some extent a dissatisfaction with the case's prosecution, which could scarcely fail to redound to

**132**

the accused's benefit. Certainly it could not injure him.

It may be contended that—in light of a possible sinister interpretation of the president's remark—the accused would have been convicted by the first court-martial in any event, and therefore that, assuming minimum evidential sufficiency, he has no just cause for complaint because the convening authority intervened to prevent the senseless formality of permitting findings of guilty, at a time when he was aware that thereafter he would be required to direct a rehearing. However, we do not believe that the president's utterance should be given the construction on which this argument would necessarily be grounded. More fundamentally, the absence of former jeopardy will not be rested by us on a prospective disregard by court members of their duty to acquit when they do not genuinely believe the evidence to demonstrate guilt beyond a reasonable doubt.

Concerning prejudice to the Government, it is obvious that, by the time of the president's remark, at least some members of the court-martial had become distinctly critical of the prosecution. However, this hostility was related to real or fancied deficiencies in the handling of the Government's case, and thus amounted to no more than the normal risk—assumed by any party to litigation—that the trier of fact will dislike his attorney's presentation. No marked friendliness to the accused had been voiced by the court. Cf. Manual, 63$f$(13). No closed mind was revealed by any member as to subsequent evidence to be offered by the Government —an attitude which would certainly indicate disqualification. Cf. Manual, 62$f$ (10). No one could contend that the president's utterance indicated so massive—so inordinate—a hostility to the prosecution that the court-martial would acquit at any cost.

The true "necessity" for withdrawing the charges here—if any—arises solely from the *untoward appearance* created by the remarks of the president. As the Manual indicates in its treatment of the subject of challenges, a trial must be kept "free from substantial doubt as to legality, fairness and

impartiality." Paragraph 62*f*(13). To some extent, this goal envisages more than the mere rendition of correct decisions in particular cases. A judicial system operates effectively only with public confidence—and, naturally, that trust exists only if there also exists a belief that triers of fact act fairly. What general confidence would—or could—be reposed in findings of guilty returned by a court-martial whose president had suggested that its members might "hang the man innocently"? Could respect be granted the determinations of a tribunal which had so much as intimated that it had prejudged the matter in hearing?

Even the accused's consent to the trial's continuation would not operate to remove the criticism that he had been adjudged guilty by a group whose members had predetermined the issues. Sight simply would be lost in the public mind of the circumstance that he had been a willing participant. Moreover, claims might well be advanced that his consent resulted from the belief that any other court appointed by the convening authority would also have prejudged the issues, from the undue pressure of his appointed counsel, from the latter's ineptitude, or from a possible distaste for having to await a second trial. Perhaps, too, the accused might disavow subsequently the consent expressed by his assigned lawyer, and insist that trial by a fair tribunal is a right too important to be permitted to constitute a proper subject of waiver through action of counsel. Cf. Himmelfarb v. United States, supra.

Of course—and despite the introduction at the first trial of the accused's apparently voluntary confession of crime—it would have been within the court's power to have acquitted him. However, an acquittal, too, might have been suspect in the public mind. It might, in fact, be suggested that the members of the court recognized the untoward character of the president's comment and wished to avoid criticism at higher levels by means of acquitting the accused and thereby precluding review. And others might conclude that the court had bent backward in an attempt to neutralize the effect of the president's remarks—and thus had failed to perform its sworn duty. See Manual, paragraph 74*a*(3), page 114. In short, after the president's utterance, action of *any* nature by the court-martial of which he was a member would doubtless command but scant public respect. Thus, from the standpoint of maintaining general confidence in military law administration, it might properly have been deemed desirable to halt the proceedings as promptly as possible, and to begin them anew in a different forum.

Earlier the belief was indicated that military law now incorporates the Federal rule governing former jeopardy. As all of us understand that rule, power exists to terminate a proceeding without the accrual of double jeopardy if the public interest demands. Within this context—it has been suggested—the term "public interest" connotes more than a correct determination of issues in a particular case. Cf. United States v. Adamiak, 4 USCMA 412, 15 CMR 412; Stone v. United States, 113 F2d 70 (CA6th Cir); Ryan v. United States, 191 F2d 779 (CA DC Cir). This premise is especially important here—for the record of trial leaves little doubt that the president's utterance revealed nothing which would *necessarily* have interfered with a sound decision. The choice of unfortunate language on his part does not destroy the rather clear inference that he was chiefly concerned with getting at the facts. Such conscientiousness can hardly interfere with a fair trial.

It seems certain that the remark having to do with "hanging" an accused person "innocently" was not genuinely meant to imply that the court would convict one whom its members did not believe to be guilty beyond a reasonable doubt. Instead, the phrase simply signified that the court-martial desired the presentation of more than a prima facie case. A court-martial must determine guilt beyond a reasonable doubt on the evidence before it. It is undeniable that there have been both civilian and military trials where available evidence was not presented which might have altered the outcome in one direction or the other. In such instances—and ob-

viously—it is not the blame of the jury, or the court-martial, that justice miscarries. In the instant case it is probable that the president was seeking to avoid such a miscarriage by means of a sharply phrased request that the Government do a better job than trial counsel had at the time achieved in investigating the facts in controversy and presenting them in court. This request—differently worded—could have injured the legal rights of no interest.

The manner of phrasing that request was, however, so misleading as to bring into operation values transcending the parties before the court. Cf. United States v. McNabb, 318 US 332, 87 L ed 819, 63 S Ct 608; Malinski v. New York, 324 US 401, 89 L ed 1029, 65 S Ct 781. Such considerations are indeed akin to those underlying the doctrines of "general prejudice" and "military due process," and serve fully to sustain the convening authority's withdrawal of the charges from the first court-martial.

Whether findings of guilty, or a sentence rendered thereon by the court-martial, could have withstood appellate review is a matter unnecessary for decision. Especially in light of the absence of objection by the defense to the president's language, it is probable that such findings could have been affirmed.[1] On the other hand, and in view of the unfortunate and confidence-destroying appearance raised here, a convening authority would not have been exceeding the bounds of proper discretion by disapproving findings of guilty and ordering a rehearing. Under such circumstances it does not seem that as a general proposition a convening authority is required to permit a trial to proceed to judgment, and thereafter to direct a rehearing as to any findings of guilt which may result. Indeed, as might be inferred from the previous discussion, Congress did not intend to confer on an accused—either under Article 44 of the Code or otherwise—a right to be placed, by reason of trial incidents beyond the control of the Government, in such a position that he *may* win and *cannot* lose in a trial. Cf. United States v. Giles, supra; Mack v. Commonwealth, supra; State v. Slorah, supra.

It has been suggested that—despite his reliance on the regrettable strictures of the court's president as grounds for withdrawing the charges—the convening authority was in fact motivated by a desire to retrieve a case which had in effect been lost through trial counsel's ineptitude. If this notion were to be accepted, former jeopardy would indeed apply—for we could not sanction the second trial if it seemed reasonably apparent that because of a want of evidence, the Government had failed originally to make a showing of merit. Cornero v. United States, supra.

It is manifest that the remarks of court members—although not attributable directly to the Government—stemmed from an understandable displeasure with the trial counsel's case, as presented at the time of the utterance of those comments. The assertions by the court's president and the earlier comment by Colonel Sellers suggest that these officers were then unconvinced of the accused's guilt. Indeed, the evidence presented at that point would scarcely have convinced any court-martial. Accordingly, if no further evidence had been forthcoming, little doubt could be entertained that a second trial was precluded—for it is certain that trial counsel will not be encouraged by us in the sloppy preparation of cases. In our view, it would be distinctly unjust to subject the accused to the inconvenience and expense of defending himself doubly under the same charge—merely because the prosecution was so unready when the case was called for trial in the first instance as to provoke the intemperate comment of court members.

The feature which distinguishes the instant case from one in which the

---

[1] For the moment, of course, we pretermit the question of admissibility of the deposition of Mrs. Ecale—which would have necessitated a rehearing. We are simply considering whether the remark by the president would—in and of itself—have demanded or justified the direction of a rehearing if no other error marred the record.

prosecutor is rescued from a failure to prove his case is, of course, that—prior to the president's injudicious comment —trial counsel had announced the calling of a further witness, Sergeant Atkinson. That witness testified that he had received a confession from the accused—one which was complete and unchallenged as to voluntariness. Consistent with the familiar dictum that a voluntary confession is the "highest order of proof," one can only conclude that the prosecution had not offered the core of its case when the president spoke. It is difficult to conclude that the court would later have ignored the confession, and would have persisted in an initial belief that guilt had not been shown beyond a reasonable doubt. Thus, it is almost impossible to view the withdrawal of the charges as depriving the accused of a probable acquittal—and as a consequence one conceivable element of unfairness is eliminated, which otherwise would constitute a premise for holding that jeopardy had attached.

## VI

Although we were to hold that the law officer alone—and not the convening authority—possessed the power to withdraw charges during the course of a court-martial proceeding, it would not follow that jeopardy had accrued here. To be sure, under this hypothesis some variety of "command influence" would have been present. However, the existence of this vice is normally remedied by a rehearing, and does not require the dismissal of charges. Yet to hold here that "command influence" produced former jeopardy would for all practical purposes equate to dismissing the charges against the accused. The evil at which Article 44 was directed—as clearly demonstrated by the legislative hearings—was the withdrawal of charges prior to findings when the Government had failed to prove its case. Since the instant record does not reveal this situation, no predicate exists in Article 44 for a holding of former jeopardy. And it is clear that Article 44 was intended by the Code's drafts-men to cover the entire field in this regard.

Moreover, although we now rule that the law officer has—since the enactment of the Code—possessed the authority to declare a mistrial, it would appear, in light of the unbroken chain of precedents to the contrary, that he was totally unaware that he did so. Indeed—and quite clearly—he would have supposed that the withdrawal of charges could be accomplished by the convening authority alone. Thus, it may be inferred that the parties to the trial at no time received the benefit of a conscious ruling by the law officer on the appropriateness and desirability of a declaration of mistrial.

The record fails to disclose how, or at whose instance, the convening authority became apprised of the president's utterance. Quite possibly it was brought to his attention by the law officer, who may well have suggested that the charges be withdrawn—this in the belief that he, the law officer, wanted power to take such action. The record of trial certainly fails to exclude such a possibility. The burden of producing evidence to sustain a plea of former jeopardy has consistently been placed on the defendant. See, e.g., Kastel v. United States, 23 F2d 156 (CA2d Cir); United States v. Giles, supra; Mack v. Commonwealth, supra; Commonwealth v. Cronin, supra. Although we were to hold that the law officer alone possessed authority to withdraw charges, the accused's evidence would nonetheless be fatally defective in failing to exclude the possibility that the former had in fact constituted the ultimate source of the action here.

## VII

Moving to the second issue of this case, we now proceed to consider the admissibility of the deposi- tion of Mrs. Ecale. The taking of this deposition was ordered by the convening authority before reference of the charges—on the ground that, as a French National, she would not be amenable to court-martial process. When that deposition was tendered in evidence against Sergeant Stringer at the second hearing, his

**135**

counsel objected to its admission on several grounds. The fifth of these was that, although the witness resided at Poitiers, France—and thus within 100 miles of La Rochelle, at which the court-martial was sitting—no showing was made that she would not or could not respond and appear. Without passing on other objections, we must conclude that consideration of the deposition by the court was precluded by failure of the prosecution to lay a proper foundation.

Article 49 (d) of the Uniform Code of Military Justice, 50 USC § 624, provides that in noncapital cases depositions may be admitted:

". . . if it appears—

"(1) that the witness resides or is beyond the State, Territory, or District in which the court, commission, or board is ordered to sit, or beyond the distance of one hundred miles from the place of trial or hearing; or

"(2) that the witness by reason of death, age, sickness, bodily infirmity, imprisonment, military necessity, nonamenability to process, or other reasonable cause, is unable or refuses to appear and testify in person at the place of trial or hearing; or

"(3) that the present whereabouts of the witness is unknown."

The words "State, Territory, or District" refer obviously to geographic areas within the United States and its territorial possessions. Since the court-martial was sitting in France, this portion of Article 49 (d) (1) is without application. The witness resided at the time of the deposition within 100 miles of the locus of the court-martial—and it must be presumed that she continued to reside there when the trial began. Manual for Courts-Martial, paragraph 138a. Thus, Article 49 (d) (1) is wholly inapplicable. In light of the same presumption of continuing residence, the whereabouts of Mrs. Ecale at the time of trial would appear to be "known," rather than the contrary. Therefore, Article 49 (d) (3) is likewise inapplicable.

She was not amenable to American subpoena by reason of her status as a French National—and no treaty with France has been brought to our attention which alters this premise. However, for Article 49 (d) (2) to come into play there must be shown an inability, or a refusal, to testify. No inability to testify is apparent in the record. Nothing in the deposition, or otherwise, suggests that Mrs. Ecale was in ill health. And the record fails to recite unavailability of transport at the time. Nor is any sort of refusal to testify revealed. In short, we have no single shred of information indicating that Mrs. Ecale would not have come to La Rochelle to testify in person, had trial counsel asked that she do so.

Under these circumstances it does not "appear" that the Government sought to erect at the trial any of the foundations for admissibility delineated in Article 49 (d). Cf. Andrews v. Hotel Sherman, 138 F2d 524 (CA7th Cir). Accordingly, reception of the deposition constituted error. United States v. Barcomb, 2 USCMA 92, 6 CMR 92. Certain courts have accepted in civil cases the scantiest proof of witness unavailability. See, e.g., Frederick v. Yellow Cab Co. of Philadelphia, 200 F2d 483 (CA3d Cir). Yet we are sure that even they would not go so far as to sanction here the substitution of a deposition for the testimony of Mrs. Ecale in open court. Cf. Smith v. United States, 106 F2d 726 (CA4th Cir); Brooks v. State, 69 Ga App 697, 26 SE 2d 549; Inda v. State, 198 Wis 557, 224 NW 733; People v. Rinesmith, 40 Cal App2d 786, 105 P2d 1021; People v. Kuranoff, 100 Cal App2d 673, 224 P2d 402. We consider it no undue burden to require that the prosecution—when it seeks to use a deposition—communicate with a nearby foreign witness, notify him of the expected date of trial, request his attendance, and advise him of any departmental regulations authorizing a fee for such attendance.

VIII

Absent the deposition, the Government was without a corpus delicti to support reception of the confessions. Therefore, irrespective of our disposition of the double jeopardy issue, the

findings cannot stand. While the author of this opinion does not consider that the second proceeding was precluded by the principle of double jeopardy—and thus differs from the views of his brothers—he harbors no doubt that the interests of justice will now be best served by a dismissal of the charges. Accordingly, the findings and sentence are disapproved and the charges dismissed.

QUINN, Chief Judge (concurring in part and dissenting in part):

I dissent in part and concur in part.

Essentially, the first question in this case is whether the convening authority of a court-martial or the law officer is the proper person to declare a mistrial because of alleged misconduct by a court member. The very statement of the problem provides me with the answer. Under such circumstances, the power to declare a mistrial is vested in the law officer.

This Court has repeatedly held that Congress intended that the law officer occupy relatively the same position as the trial judge in a civilian court. Certain differences are set out in the Uniform Code, see United States v. London, 4 USCMA 90, 15 CMR 90, but the Congressional conception was outlined by the author of the present majority opinion in one of our early cases, as follows:

"The legislative background of the Uniform Code makes clear beyond question Congress' conception of the law officer as a judge to all material intents and purposes." [United States v. Berry, 1 USCMA 235, 241, 2 CMR 141.]

In United States v. Berry, supra, we reversed the accused's conviction because the president usurped the functions of the law member, the precursor of the law officer. More recently, in United States v. Knudson, 4 USCMA 587, 16 CMR 161, we set aside a conviction because the convening authority interfered with the law officer in the exercise of his sound discretion in granting a continuance to the accused. In a separate opinion, Judge Brosman took occasion to say that he considered

such interference as constituting "command control," which is to be condemned under the doctrine of general prejudice, rather than that of specific prejudice. In United States v. Jackson, 3 USCMA 646, 14 CMR 64, Judge Latimer, writing for the Court, said (page 652):

". . . The law officer is not a mere figurehead in the courtroom drama. He must direct the trial along paths of recognized procedure in a manner reasonably calculated to bring an end to the hearing without prejudice to either party."

Consequently, it would seem that, if the civilian judge, the law officer's prototype, has inherent power to declare a mistrial, the law officer possesses the same authority, unless the Uniform Code directly or by necessary implication deprives him of it. It is appropriate, therefore, to ascertain the power of a civilian judge to declare a mistrial, and the nature of such power.

Oddly enough, the very cases cited by the majority hold that a judge in a civilian criminal court has inherent authority to discharge a jury from giving a verdict whenever the ends of public justice require. Thompson v. United States, 155 US 271, 39 L ed 146, 15 S Ct 73; Simmons v. United States, 142 US 148, 35 L ed 968, 12 S Ct 171; United States v. Perez, 9 Wheat 579, 6 L ed 165. The rule was set out by the United States Supreme Court, in the Perez case, as follows:

". . . We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and,

in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. *But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the judges, under their oaths of office."* [Emphasis supplied.]

With the power of a trial judge to declare a mistrial irrefutably established, the next problem is to determine its character. Is it a final disposition of the case which is generally subject to immediate appeal, or is it only interlocutory, and thus not normally appealable, except as part of the final disposition? 4 CJS, Appeal and Error § 92. Since the declaration of a mistrial does not end the proceedings against the accused, its interlocutory nature is virtually self-evident. This may explain the dearth of judicial opinion on the subject. In Phoebus v. Connellee, 228 SW 982, the Texas Court of Civil Appeals held that the declaration of a mistrial by the trial judge is an interlocutory ruling. The same principle appears, by clear implication, in a number of Federal cases. Cavness v. United States, 187 F2d 719 (CA 9th Cir 1951), cert den 341 US 951, 95 L ed 1374, 71 S Ct 1019; Dowell, Inc. v. Jowers, 182 F2d 576 (CA5th Cir 1950); Utley v. United States, 115 F2d 117 (CA 9th Cir 1940), cert den 311 US 719, 85 L ed 468, 61 S Ct 440. Logically, and on the authority of the cited cases, I am convinced that the trial judge's ruling on a mistrial is basically interlocutory.

With certain exceptions not important here, the law officer is specifically authorized by the Uniform Code to rule finally on all interlocutory matters arising in the course of the trial. Article 51, Uniform Code of Military Justice, 50 USC § 626. Since the declaration of a mistrial is interlocutory, the Uniform Code plainly requires the law officer, not the convening authority, to make the initial ruling. However, if the language of the Code alone is insufficient to establish this as the intention of Congress, the Congressional hearings provide the additional proof needed to make the point practically incontrovertible. Mr. Felix Larkin, Assistant General Counsel, Office of the Secretary of Defense, and one of the principal draftsmen of the Uniform Code, was questioned by members of the subcommittee of the House Armed Services Committee regarding the power of the law officer to declare a mistrial. This discussion should remove any possible doubt as to the authority of the law officer to declare a mistrial.

"Mr. De Graffenried. Now suppose a law officer were to rule one way on a question of law and the members of the court who were lawyers themselves thought he was absolutely wrong about it, would his ruling be advisory to the court or would it be absolutely binding on them?

Mr. Larkin. It is absolutely binding, except for the fact of course that any member of the court whether he is a lawyer or otherwise may for his own personal reason not follow them, which is a situation that obtains in any court in the land. The judge may rule on the questions of law and he may instruct the jury and charge them and as it happens the jury goes out and pays no attention to them whatever. But that is something over which no one has any control in any tribunal.

Mr. De Graffenried. He acts as the judge on questions of law?

Mr. Larkin. That is right. He acts as an outright judge on questions of law and his rulings are final and binding. Whether any individual person decides that he doesn't want to follow them or not of course is a different problem.

Mr. Brooks. It is just binding in reference to interlocutory decisions, isn't it?

Mr. Larkin. And it is binding on his instructions, before they retire, as to the elements of the offense and on the other law of the case, if necessary.

Mr. Durham. He would still have the right to rule on a mistrial, wouldn't he?

MR. LARKIN. That is right; he has the right. . . ." [Hearings before House Committee on Armed Services, 81st Congress, 1st Session, on H.R. 2498, page 1154.]

Considering the language of the Code and its legislative background, it is clear that the law officer has the same power as a trial judge on the question of declaring a mistrial.

The practice now proposed by the majority not only violates the spirit of the Uniform Code, but is also contrary to standards of orderly procedure. The majority admit that the convening authority does not, and probably cannot, properly observe the impact of any prejudicial incident. They also admit that, unlike the law officer, he is completely unable to neutralize the possible harmful effect of an untoward occurrence by appropriate instructions to the court members. Nevertheless, they grant him the exclusive right to inject himself into the trial, and decide whether a mistrial should or should not be granted. In effect, this makes the convening authority an auxiliary trial judge.

Once a trial begins, the law officer, not the convening authority, is responsible for its proper conduct. True, the convening authority will ultimately review the legal correctness of the law officer's rulings, but as an appellate authority, the convening authority cannot assume the powers and functions of a trial judge. Schilling v. Schwitzer-Cummins Co., 142 F2d 82 (CA DC Cir 1944). If a mistrial should be declared but the law officer does not take the proper action, the error may be corrected in the regular course of appeal from the conviction. See Cavness v. United States, supra. Conversely, if the law officer improperly grants a mistrial, his ruling may then be subject to review by the convening authority under the provisions of paragraph 67f of the Manual for Courts-Martial, United States, 1951. Cf. United States v. Knudson, supra. In either case, a determination must be made first by the law officer. By virtue of his office, he is primarily responsible for insuring that the trial is conducted without prejudice to either the accused or the Government. United States v. Perez, supra; State v. Slorah, 118 Me 203, 106 Atl 768. He alone is in a position accurately to appraise the effects of a possible prejudicial incident and neutralize it by appropriate instructions. See: Utley v. United States, supra. Moreover, whatever action he takes is taken in open court, with an opportunity to all interested parties to present their views. See Manual for Courts-Martial, supra, paragraph 67e, page 97. State v. Nelson, 19 RI 467, 34 Atl 990. Under the practice advocated by the majority, the convening authority may, as he did in this case, act ex parte. Recently ex parte procedure in matters of this kind was condemned by the United States Supreme Court in Remmer v. United States, 347 US 227. In a unanimous opinion the court said:

". . . The trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate."

See also People v. Parker, 145 Mich 488, 108 NW 999.

In support of their position the majority cite Wade v. Hunter, 336 US 684. It is difficult for me to comprehend its applicability to the present situation. The convening authority in the Wade case did not purport to act as a judge regulating the actual conduct of the trial; nor did he seek to exercise a power inherent in the office of the law member. The Supreme Court decided only that the convening authority could withdraw charges from a court-martial convened by him, and composed of officers of his command, when the tactical situation required that those officers apply themselves to military functions. Nothing said by the Supreme Court justifies the majority's conclusion that the convening authority may act as an auxiliary judge in the conduct of the

**139.**

trial. In my opinion, the convening authority illegally usurped the duties of the law officer. United States v. Knudson, supra. By his action the convening authority improperly terminated the first trial. Since this termination occurred without fault on the part of the accused and over his objection, at a time when jeopardy would normally attach, the plea of double jeopardy was properly interposed when the accused was again brought to trial on the same charges. It was error to deny the plea.

As for the deposition, I agree that it is inadmissible. The charges should be dismissed on this ground, as well as on that of double jeopardy.

LATIMER, Judge (concurring in the result):

I concur in the result.

It is not necessary in this case that we determine the power of a law officer to declare a mistrial. We really need go no further than to determine whether a convening authority can withdraw charges and specifications from one court-martial and refer them to another. However, the matter has been reached by my associates, so it should be laid to rest. I, therefore, express my views on the subject.

I

We have declared that in areas where there is no clash with the Code, the Manual, or long-established legal principles, the law officer in the military system has powers comparable to those of a judge in the civilian court. One of the law officer's principal purposes is to control and direct trial proceedings along well-recognized legal paths within the framework of the Uniform Code of Military Justice. Particularly, is that true with respect to areas which involve rulings on questions of law. If an inflammatory circumstance occurs during the course of a trial which is of sufficient importance to prejudicially affect the right of either party, and it cannot otherwise be corrected, the proceedings should be terminated. In civilian courts, a trial judge can determine

the effect of an unexpected and improper incident, and if one occurs and he concludes that fairness and impartiality cannot be assured to either party, he has the authority to excuse the jury and retry the case before another panel. I find no Congressional expression which intimates that the same power does not vest in the law officer in the military judicial system. Either Congress clothed him with the authority to do so or courts-martial must seek outside help to carry on their ordinary functions. In order to avoid that and to insure an orderly and efficient administration of justice, the right to keep the proceedings free from error should, in the first instance, be lodged with the court-martial. Under that view the granting of a mistrial and then a retrying of the case requires the joint actions of the law officer and the convening authority, but that obstacle is not insurmountable. Conceding it requires cooperation on the part of two officials, that is an administrative detail which must be faced if the Code permits no construction other than that the military counterpart of the civilian judge can terminate the proceeding, when in his opinion a fair trial cannot be had for either party. That Congress empowered the law officer to discontinue a trial for obvious prejudice seems implicit in the wording of Article 51(b) of the Code, 50 USC § 626, which provides that he shall rule on all interlocutory questions arising during the proceedings. Unless Congress intended the phrase "interlocutory questions" not to include a mistrial, then there is an express grant to him of authority to end the hearing.

The language of the enactment is unambiguous and not restrictive except as his rulings might be subject to objection. However, the author judge has some reservations concerning the conferring of authority and one of the reasons he assigns for his reluctance to hold Congress granted the power is stated by him as follows: "One circumstance suggesting these doubts is the fact that all of the Armed Services have ruled consistently that a court-martial, or any element thereof, is without power to declare a mistrial, and

140

that the motion for a mistrial is unknown to military law." The cases he cites so state, but in two of the opinions I find that the boards of review considered the motions for a mistrial made by the accused as being motions for appropriate relief and then proceeded to consider the principles involved under that method of raising the question.

It may be that we are all stumbling over misdesignations of the motions, but in the end it matters little whether we label an application which seeks a termination of the trial proceedings, not amounting to a finding on the merits, as a motion for appropriate relief or mistrial. The important issue is whether the law officer has been clothed with the authority to grant either form of relief. Again, it may be that, contrary to some statements in military cases, over the years mistrials were known to the military judicial system but were not often used because other appropriate methods were available to reach the error. For instance, I find reference to termination of court-martial proceedings at various stages by writers on early military law, and some quotations specifically mention mistrials. Winthrop's Military Law and Precedents, Second Edition, 1920 Reprint, page 263, states:

> ". . . So, at military law, neither a mere arraignment, nor an arrest followed by a discharge without trial, nor a service of charges withdrawn or dropped without prosecution, nor a withdrawal of the charges after arraignment or pending the trial, nor a discontinuance of the proceedings, by the order of the convening authority, for any cause before a finding, nor a permanent interruption of the same by reason of war or other exigency, *nor a failure of the court to agree upon a finding, followed by a dissolution*—will amount to an acquittal or a 'trial' of the accused." [Emphasis supplied.]

In the same author's Abridgment of Military Law, published 1887, page 104, he states:

> ". . . When thus once found, should he be again arraigned for the

same offence, he may effectually plead a former trial in bar of the second. *It is otherwise, however, if the first proceeding did not reach an acquittal or conviction, but was for any cause interrupted and discontinued;* or if the court, though coming to a finding, was in fact without jurisdiction; or its proceedings were for other reason invalid. 'Tried' means not only fully, but legally tried." [Emphasis supplied.]

Tillotson in Articles of War Annotated, page 84, states:

> ". . . If the *first court fails to reach a finding*, or becomes reduced below the required minimum of members, or is dissolved, or when for any cause, *without fault of the prosecution, there is a mistrial,* or the trial is terminated or the court dissolved before final acquittal or conviction, there is no former jeopardy (12–167, 168)." [Emphasis supplied.]

In the Digest of Opinions of the Judge Advocates General of the Army, Revised Edition, 1901, page 92, I find the following statement:

> ". . . Where, for *any* cause, without fault of the prosecution, *there was a 'mistrial,' or the trial first entered upon was terminated,* or the court dissolved, at any stage of the proceedings before a final acquittal or conviction. V, 192, *October,* 1863; 32, 29, *April* 1889." [Emphasis partially supplied.]

The Manual for Courts-Martial, U. S. Army, 1917, Corrected to August 1, 1918, paragraph 149(c), pages 68–69, states the following:

> ". . . Where, for any cause, without fault of the prosecution, *there was a 'mistrial,'* or the trial first entered upon was terminated, or the court dissolved, at any stage of the proceedings before a final acquittal or conviction. (Digest, p. 167, C, II, B.)" [Emphasis supplied.]

Converted to the parlance of civilian practice, those authorities seem to suggest that "hung juries," discontinuances, terminations and mistrials were not entirely unknown in early military law. While I suppose it is accurate to

**141**

state that the method ordinarily used in the military legal system to escape the effect of a prejudicial occurrence was for the convening authority to withdraw the charges and refer the case to another court-martial, it does not necessarily follow that Congress, when it enacted the Uniform Code of Military Justice, intended that that means was to be used exclusively in the future. The Code does not so state; and with the advent of the law officer, the necessity for seeking the legal advice of the convening authority was lessened. A judge was placed at the trial level to deal effectively with trial irregularities, and, absent a clear Congressional mandate to the contrary, he should not be stripped of his authority to perform an important function. Certainly the members of the Armed Services Committee of the House of Representatives were not entirely unfamiliar with the fact that the framers of the Code had considered the problem of granting ordinary judicial powers to a law officer, as they were specifically advised by Mr. Larkin that, under the new procedure, a law officer would rule on all interlocutory questions including a motion for mistrial.

A primary rule of statutory construction is that a statute should be so construed as to carry out the will of Congress. It seems to me that Congress in its latest enactment willed that a court-martial should be manned with trained personnel and should be granted sufficient power to try a case in all of its aspects without having to seek outside help. The system created did not permit complete divorcement between the court and the convening authority and many powers remain vested in him, but the thrust of the legislation was to grant autonomy to the court-martial. The areas where it was subordinate to the convening authority were reduced but in my judgment there are fields where they presently overlap and so long as the Code does not prevent either from carrying out the duties imposed by the Manual, or those necessary to the proper operation of a court, we should not interfere. If Congress sought to make the court-martial self-sufficient, then to deny to the law officer the right to terminate litigation when a court incident prevented either party from gaining a fair trial would be in conflict with that purpose. Moreover, it would unnecessarily require the intervention of a convening authority to rule on a question of law which ought to be decided by the judge of the forum in which it arose. While, under the present provisions of the Code and the Manual, the convening authority has not been divested of his power to terminate hearings, I see no good reason for not permitting a law officer who is better situated to exercise the same authority. An observer to the incident occupies a "ringside seat" and is in a preferred position to assess the prejudice. Furthermore, there is no reason to suspect that the present-day law officers are unqualified to measure the impact on court-martial members. Certainly, Congress must have intended to prescribe a workable and orderly procedure with a minimum of outside interference, and a strengthening of the hand of the law officer helps to bring about that result. Considering the wording of the Code in the light of the results to be accomplished, I have no hesitancy in concluding that when Congress decreed that a law officer should rule finally on interlocutory questions arising during the course of a hearing, it did not mean to reserve mistrials from that category.

The strongest argument against the position I take is that the Code and the Manual fail to mention mistrials, and in discussing termination of proceedings before findings, the Manual deals only with the powers of the convening authority. Article 44(c) of the Code, 50 USC § 619, provides:

"A proceeding which, subsequent to the introduction of evidence but prior to a finding, is dismissed or terminated by the conveying authority or on motion of the prosecution for failure of available evidence or witnesses without any fault of the accused shall be a trial in the sense of this article."

That Article is dealing with double jeopardy and it does not support a contention that the right to terminate pro-

ceedings belongs exclusively to convening authorities. However, the Manual is specific in its limitation, as it states that a specification will be withdrawn only when directed by the convening authority. If, because of previous military rulings, a mistrial must be considered encompassed within that statement the provision poses several problems of statutory construction. First, it does not find express support in the Code; second, it appears in conflict with the Code provision which authorizes the law officer to rule finally on interlocutory matters; and third, if a convening authority alone can grant a mistrial, then an undesirable result follows as the court-martial is denied a right which is an inherent power of every court.

So far as expressly denying the law officer the authority to terminate a trial, the Code is silent. However, it has been suggested that Article 44(c), supra, by implication, supports the view that only a convening authority has that power. Conflicts by implication should be avoided and it requires more than mere deduction to overcome the specific grant of authority to the law officer found in Article 51(c), supra. Moreover, Article 44 could be interpreted reasonably to apply to happenings outside of the trial proceedings. For the reason that I find no provision of the Code which directly or indirectly impinges on the powers conferred on the law officer to declare a mistrial, I am not faced with reconciling inconsistent provisions of the same statute.

We have repeatedly announced the principle that if provisions of the Code and the Manual do not conflict with each other, we will give full force and effect to the provisions of both. We have likewise stated that if there is a conflict between the two, the language of the Code will prevail. Applying that principle of construction to the wording of the Manual, if a mistrial is no more nor less than a withdrawal of the charges and specifications, the provisions of the Manual clash head-on with the Code, and the former must yield. If, on the other hand, a mistrial is something less than, or different from, a withdrawal of a specification, then the inconsistencies vanish. It would not be difficult to reconcile the two provisions in question if it were not for one of the examples set forth in the Manual. In paragraph 56b which discusses the withdrawal of specifications, I find the following statement:

". . . Similarly, if inadmissible information highly prejudicial to either the Government or the accused, has been brought to the attention of the court, and it appears to the convening authority that the members of the court cannot be reasonably expected to remain uninfluenced thereby, he may withdraw the case from that court and refer it to another court."

The example used portrays a typical mistrial ruling, but other statements in the Manual disclose that specifications can be withdrawn for sundry reasons and mistrial is only one of the many. I might, therefore, seek a reconciliation by a holding that the Manual deals generally with all happenings which might justify a withdrawal of a specification, while the Code is limited to incidents occurring during the trial phase. However, I prefer to escape that horn of the dilemma by assuming that the framers of the Manual contemplated they were limiting the right to grant a mistrial to the convening authority. Based on that assumption, the Manual statement must be disregarded to the extent of the conflict. However, that alone does not solve the problem, as I am faced with the argument that a construction which divides authority is undesirable.

While, as a general proposition, divided authority is frowned upon, the growth and development of military law has resulted in an overlapping of certain duties and responsibilities. At the present time certain rulings of the law officer are subject to reversal by the convening authority. If a motion challenging a specification is granted by the law officer, the convening authority may return the record for reconsideration. Article 61, Uniform Code, 50 USC § 648. Both may grant a continuance. Paragraph 58c, Manual for Courts-Martial, United States, 1951.

**143**

Either may set the time for hearing of a case or may reconvene the court after a recess or a continuance. In case of a defective specification the law officer may continue the case to permit trial counsel to refer the matter of further proceedings to the convening authority. Paragraph 69b(3), Manual for Courts-Martial, supra. If a specification is dismissed on a motion and the ruling does not amount to a finding of not guilty, the convening authority may direct a reconsideration. Article 62(a), 50 USC § 649. When any motion raising a defense or objection, which prevents the trial from proceeding, is sustained by a law officer, the court will adjourn and submit the record of its proceedings to the convening authority. Paragraph 67(f), Manual for Courts-Martial, supra. In questions of insanity at the time of trial the powers of the two officials seem to blend. Paragraph 122b, Manual for Courts-Martial, supra. See also my dissent in United States v. Knudson, 4 USCMA 587, 16 CMR 161. All but the last of the foregoing citations grant to the convening authority the right to operate in certain areas and yet the law officer is not precluded from first taking action if he elects so to do. In this instance, I would permit him to operate in the same general manner. He can either grant the motion for mistrial and have trial counsel forward the record to the convening authority to take further action with respect to forwarding the case to another court, or he can continue the case and refer the record to the convening authority for an original order on the withdrawal of a specification. Principally because the issue can be better developed in the trial forum, with both parties and their counsel present, I believe the former to be the better procedure. However, if the record is made in sufficient detail to permit an adequate presentation to the convening authority, he could dispose of the issue by one order. In either event, the ruling should be subject to review by boards of review and this Court, and the proceedings before a convening authority ought to be reported verbatim. Perhaps when the Code is revised and the Manual rewritten, the boundaries of authority between the two func-

tionaries can be more clearly delineated, but under the present law they entrench upon each other. To avoid unnecessary conflicts, I believe the best results can be obtained if the law officer operates in the judicial field and the convening authority acts in his usual capacity of reviewing officer, or on matters more administrative in character. No one should seriously contend that when tactical or military considerations not affecting the guilt or innocence of the accused compel the action, the commander should not act without hesitation and without reference to the law officer. In those fields he is and should be supreme. Certainly, in a system which requires consideration of legal and military necessities, the mere fact that two officials are empowered to act in the same general areas does not make the legislation offensive. Particularly is that true when the convening authority has been granted the right to affirm or reverse many of the rulings of the law officer.

## II

An extensive discussion of the power of the convening authority to withdraw charges and specifications and refer them to another court is unnecessary. Judge Brosman does not elaborate on that as an issue, and rightly so, as that power has always vested in the convening authority. Winthrop's Military Law and Precedents, supra, at page 155, has this to say on the subject:

"The officer preferring charges is not entitled to have them brought to trial, nor has an accused a vested right in having charges against him adjudicated. The convening authority, representing the United States, may always withdraw charges before trial; may cause or authorize a *nolle prosequi* to be entered as to a charge or specification after the charges have been placed before the court and even after arraignment, and may cause or authorize charges or specifications to be amended. But—so far as concerns the court and the parties —charges duly referred for trial are, in law, ordered to be tried as they stand. Thereafter to assume to amend them without proper author-

144

ity is a military offence. As will appear in Chapter XVI, the court may strike out a charge or specification on motion of the accused if sufficient cause be exhibited; but, self-moved (or in the absence of an issue) and of its own original capacity, it has *no power whatever to amend, modify, discard, or withdraw, or direct to be stricken out, any part of the charges or specifications officially committed to it for trial.* . . ."

The Manual for Courts-Martial, U. S. Army, 1917, Corrected to August 1, 1918, paragraph 97, states that principle in the following language:

". . . He [The judge advocate] may ordinarily correct obvious mistakes of form, or slight errors in names, dates, amounts, etc., but he will not, without the authority of the convening officer, make *substantial* amendments in the allegations, or—least of all—reject or withdraw a charge or specification or substitute a new and distinct charge for one transmitted to him for trial by the proper superior. (Digest, p. 496, IV, B, 1.)"

No recent Congressional enactment has taken away the power of the convening authority to control charges and specifications and all of them have assumed his right and power to do so. The United States Supreme Court in Wade v. Hunter, 336 US 684, supports that assertion. In addition, Article 44 (c) of the present Uniform Code of Military Justice, previously quoted, acknowledges his authority to terminate the proceedings. In the light of those convincing authorities any contention that the convening authority does not have the power to issue a directive to withdraw a specification is without merit.

### III

I concur with the author Judge's approach that we should review the ruling of the convening authority to determine if he exceeded his authority. In view of the fact that we dismiss the case, any argument on this phase of the case is relatively unimportant, but because my views are partially in conflict with those announced by him, I will set them forth. First, I agree with the concept announced by the author Judge that manifest necessity embraces keeping the proceedings free from substantial doubt as to legality, fairness, and impartiality. He makes an excellent argument to support the position he takes, but I go one step further and consider the entire record. Should we not as a court look to the entire record and determine from it whether those factors are present? What may be an attempt to cleanse the first trial of error may turn out to be more unfair than the original incident. When I consider the act of the convening authority in the light of both trials, I conclude the accused's conviction is not supported by a foundation of fairness. In so concluding, I am influenced by the delayed action of the convening authority and the peculiar facts of this case.

Before considering the merits of the question confronting us, I should first state that had the law officer declared a mistrial immediately after the incident occurred, I would have affirmed his ruling. At that point in the proceedings, the evidentiary structure was incomplete, he could not have appraised the merits of the case to the detriment of either party, and he was a bystander who could have sensed the effect of the statement on other members of the court. Had he acted at the moment the proceedings would not have been unfair to the accused. He would have had the benefit of intangible factors to support his ruling which were not measurable by the convening authority who obtained his information second-hand. Any impression obtained by the latter were colored by the views and interest of the reporting person. Moreover, in hearing the issue in court, counsel for both parties would have been present to protect the rights of their clients and all proceedings would have been fairly reflected in the record. A decision arrived at in open court in the presence of all parties is apt to be less arbitrary than one made in an unrecorded session. Furthermore, the opportunity to protect a cause on appeal is limited if a record of the proceedings has not been fully preserved.

I believe that the framers of the Manual intended, in so far as consistency with the Code would ▬▬▬ permit, to equate the military and civilian rules on double jeopardy. However, they hedged in the convening authority's power by including a caveat that it should be exercised only with the greatest caution, under urgent circumstances, and for plain and obvious reasons. It is that limitation which causes me difficulty in the present instance.

The Manual in dealing with the subject states:

"If evidence on the issue of guilt or innocence has been received after a plea has been entered, a withdrawal of a specification because of a failure of available evidence or witnesses, without any fault of the accused, amounts to jeopardy and constitutes a trial in the sense of Article 44. However, withdrawal of a specification because of manifest necessity in the interest of justice is not a bar to further prosecution. Thus, if urgent and unforeseen military necessity requires that a trial be terminated, and it does not appear that the military situation will permit resumption of the trial within a reasonable time, the withdrawal of a specification will not prevent a later trial for the same offense. Similarly, if inadmissible information, highly prejudicial to either the Government or the accused, has been brought to the attention of the court, and it appears to the convening authority that the members of the court cannot be reasonably expected to remain uninfluenced thereby, he may withdraw the case from that court and refer it to another court. The power to withdraw a case after evidence has been taken on the issue of guilt or innocence will be exercised only with the greatest caution, under urgent circumstances, and for very plain and obvious causes. A specification will not be withdrawn arbitrarily or unfairly to the accused in any case." [Manual for Courts-Martial, United States, 1951, paragraph 56b.]

That paragraph can be interpreted

as breaking manifest necessity into two general categories, namely, ▬▬▬ military exigencies and judicial mistakes. Those are not refined classes but they are sufficient for the purpose of this case. The first class permits a termination of the proceedings if urgent and unforeseen military necessity requires that such action be taken. This is a doctrine announced in Wade v. Hunter, supra; but that case is authority only for the proposition that the convening authority may withdraw the specification when the military situation makes a continuation of the trial impracticable. The second class, and the one of importance to the present problem, authorizes discontinuation of the trial if inadmissible information, highly prejudicial to either the Government or the accused, has been brought to the attention of the court-martial, and it appears to the convening authority that the members cannot be reasonably expected to remain uninfluenced thereby. In both categories the Manual warning that the power can only be exercised with caution, under urgent circumstances, and for very plain and obvious causes should be heeded. I, therefore, conclude we must test the facts of this case by the Manual specifications and if, after allowing some latitude to the convening authority, we cannot say the designated particulars have been met, then the plea of double jeopardy must be sustained.

The first element to be considered is whether the incident was highly prejudicial to either the Government or the accused. I ▬▬▬ encounter a great deal of difficulty in determining which party, if either, was detrimentally affected by the remark. This, for the reason that prior to the comment the case had been very poorly managed. There had been three unreported side bar conferences, three recesses, and considerable arguing among counsel and the law officer over questions of double jeopardy, selection of court members, the admissibility of a deposition and many of its interrogatories. At the end of one and one-half hours, not one bit of evidence had been admitted. Just prior to the happening of the incident disclosed in

the colloquy quoted by Judge Brosman, the third recess was requested and the president of the court stated: "Well, are we going to have a court, or aren't we?" This was followed by introduction of the interrogatories and answers of the victim. The latter were indefinite, uncertain, and confusing and the law officer was required to strike some of the individual answers. Continuity was destroyed and because of language difficulties and the use of the third person by the complaining witness, her testimony on identification was doubtful. When counsel for defense realized his cross-interrogatories were damaging, he unsuccessfully sought to withdraw them. A companion of the accused was called and his testimony was far from convincing. One member of the court-martial sought to question him but he ran afoul of the rules of evidence and he sought to justify his questions by complaining that the evidence was "inconcise and confused." When the trial counsel called the next witness the president requested permission to talk to the law officer. The latter explained the conversation must be on the record, and the president then spoke his piece. It might be expected that out of that welter of confusion a complaint would be registered but it is the sheerest speculation as to whether either party was prejudiced by the views expressed. My impression is that the president was vocalizing his disgust at the apparent unpreparedness of both counsel. Be that is it may, the proceedings settled down, an extrajudicial confession of the accused was admitted in evidence, and the matters in dispute became more certain. At the time the matter reached the convening authority the issues were developed fully and the incident, in all probability, had lost its importance. When he acted, there remained little reason to believe that a mistrial was necessary to purge any possible prejudice.

The necessity for urgency likewise seems to be lacking. Assuming the convening authority proceeded to consider thoroughly all important aspects of the case, I find no necessity for haste. The court had recessed for the evening. All evidence had been admitted, except a stipulation of value, and the court was to reconvene the following morning to hear arguments of counsel. The convening authority had a number of alternative remedies. He could have obtained the desires of counsel; he could have notified the law officer to afford either one of them an opportunity to move for a mistrial, if they so elected; or, he could have conditioned an order to continue upon the consent of the accused. Had defending counsel rejected an opportunity to have the specification withdrawn, I am certain that the fairness of the proceedings could not have been assailed and the accused could not complain on appeal. Conceding that a convening authority should not be charged with error because he does not choose the best method, those suggested by me offer some alternative ways of dealing with the question and they make a contention of urgency sound hollow.

The only other question bearing discussion is whether the specification was withdrawn unfairly to the accused. The record bears persuasive evidence that it was. By restating some of the facts I have mentioned, together with some not set forth, I hope to support that statement. The decision was made between the afternoon recess and the morning session. There was no compelling reason for urgent action. During the colloquy the law officer, in no uncertain language, had instructed the court members that they were to decide the guilt or innocence of the accused and not to prosecute the case. That had a definite tendency to remove any taint of influence. At the time the convening authority took his action, the incident was stale; the evidentiary drama had been completed; and the weakness of the Government's case was apparent. He had the factual structure fully developed and its weaknesses and strength could be ascertained. The accused had elected not to testify and his only chance for favorable consideration was that the Government had not established his guilt beyond a reasonable doubt. For aught that appears, he was unaware that his fate was being decided in what may have been a secret

**147**

session while the court-martial was in recess; and I would place on the Government the burden of showing accused had been heard before the order was made. The record fails to show that he was offered any opportunity to plead his cause before the action was ordered even though the results of the action taken were calculated by the staff judge advocate who took the precaution to state in the letter of transmittal that double jeopardy was not involved. Absent a showing to the contrary, this smacks of a star chamber session.

I have not overlooked the fact that the Government has a right to a fair and impartial trial; but a party at fault cannot seek a mistrial. Aside from that, I fail to see what prejudice the Government suffered. No exception to the remark was taken by its representative. Trial counsel was content to rely on the fairness and impartiality of the selected members, and the law officer sensed no unfairness to the prosecution. Counsel for the Government can waive a mistrial to the same extent as can defending counsel. It is a bit unusual for an outsider to feel that an incident is highly prejudicial to the Government when an active participant is unimpressed by its seriousness. If the comment was justified, some burden must be borne by the prosecution. True the evidence aliunde the confession was weak and unconvincing; and due to the difficulties involved in using a deposition and presenting evidence through an unfriendly witness, trial counsel was operating under trying circumstances. However, preparation beforehand is required, and a mistrial cannot be used to afford the Government an opportunity to shore up its case. My impression from this record is that a desire to do that played an important role in the decision to withdraw the specification. Taking everything into consideration, I find the withdrawal was arbitrary and legally unfair to the accused.

IV

I concur with Judge Brosman on the principles he announces in holding the deposition inadmissible.