UNITED STATES, Appellee

v.

SAMUEL A. CARVER, Private, U. S. Army, Appellant

6 USCMA 258, 19 CMR 384

261

*Lieutenant Colonel Joseph L. Chalk* argued the cause for Appellant, Accused.

*Lieutenant Colonel Andrew D. Kane* argued the cause for Appellee, United States.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This accused stands sentenced to die. Despite his plea to the contrary, a general court-martial sitting in Germany found him guilty of premeditated murder, robbery, and assault with intent to commit murder, in violation of Articles 118, 122, and 134, Uniform Code of Military Justice, 50 USC §§ 712, 716, and 728, respectively. Intermediate reviewing authorities have affirmed the findings and sentence. We have reviewed the record in accordance with the provisions of Article 67 (*b*) (1) of the Code, 50 USC § 654, and we find error in the instructions which requires corrective action. Parenthetically, we note that the board of review attempted to supply the instructional omission, but for reasons which we hereinafter set out, the deficiency cannot be corrected in the manner attempted.

The offense of robbery was committed by the accused as a means to accomplish the vicious killing with which we must deal, and the assault was committed as an aftermath of the homicide. There is no substantial dispute between the defense and the Government on any of the facts concerning the substantive offense. Stated generally, they show that on the afternoon of May 22, 1954, the accused, with authority, left Mansfield Kaserne, where he was stationed, and went to Straubing, a nearby town in Germany. He returned to the post at around 4:30 the following morning. As he entered the main gate, his pass was taken from him by Corporal Pannett, the gate guard, who was under orders to hold the passes of any men coming in after 1:00 a.m. The accused protested this action, and after hearing his complaint, Corporal Pannett suggested to him that he might see the Officer of the Day on the matter. Upon learning the nature of the accused's business, that officer refused to hear about his difficulties and sent him on his way. The accused returned to the guard post and asked Corporal Pannett for his name. After receiving an answer, the accused threatened to kill the corporal. The latter was inclined to consider the threat as the idle chatter of a drunk, but the accused voiced a second threat of violence and then stomped away toward his company. About an hour later, he went to his company orderly room and secured the keys to the arms room, from which he appropriated a carbine. Shortly thereafter, he appeared at the post ammunition dump, held up the guard on duty, took his carbine, pulled out the telephone wires and used them to tie up the guard, stole over 500 rounds of ammunition, appropriated a 2½-ton truck, and drove to the main gate of the Kaserne.

Meanwhile, the 6:00 a.m. guard relief had been posted, and a Corporal Shelton had replaced Corporal Pannett as the gate guard. Shelton and Pannett were of approximately the same height and build, and were dressed alike. When the accused drove up and stopped, Corporal Shelton started from the guard post in the direction of the truck. As he approached the vehicle, the accused pushed two carbines through the open window and fired point blank at Corporal Shelton. The accused then dismounted and fired more rounds into the prostrate body on the ground, inflicting a total

262

of about 25 wounds on Shelton's body. Continuing in his course of violence, the accused pursued and fired at the German civilian guard who was also on duty at the guard post, but none of the shots found their mark. Lieutenant Goellner, the Officer of the Day, was aroused by the noise of the first burst and came out of the guardhouse to investigate. He quickly appraised the situation and, being unarmed, retreated into the building. The accused shouted at him and sent a burst of fire through the door behind him. Lieutenant Goellner armed himself and then engaged the accused in a firefight. The accused took cover against the guardhouse wall, where he was out of the line of fire, and he reloaded the clips to both his carbines. Meanwhile, Lieutenant Goellner had slipped out the rear window and approached the accused from the side. When Goellner fired at him and called upon the accused to surrender, the accused returned the fire. As the exchange of shots continued, the accused retreated, finding shelter first beside a truck, and later behind a tree, further up the street. When the Lieutenant maneuvered so as to have a clear field of fire at the person of the accused, Carver apparently realized that his position was no longer tenable, for at Goellner's command he threw away his weapons and surrendered. The accused had been wounded in the knee and chest during the exchange.

At the trial following arraignment, defense counsel entered a motion for a finding of not guilty by reason of insanity. In support of the motion, he adduced evidence on all the facts set forth above and, in addition, showed that when the accused returned to the post on the morning of the offenses, he carried a live bird in his hand which he petted occasionally with one finger. It was further shown that he carried a kitchen type knife under his blouse; that he awakened the company Charge of Quarters just prior to appropriating the carbine from the company arms room and stood silently over him with the bird in one hand and the knife in the other; and that the bird was later found dead in the doorway nearest the arms room. Defense evidence also tended to prove that the accused had been drinking; that he had a vicious temper when he was under the influence of alcohol; and that after drinking he had in the past become violent.

In addition to the testimony of a lay witness concerning unusual behavior by the accused even when sober, the defense called a psychiatrist, one Captain August, who testified at some length on the accused's sanity at the time of the offense. Based upon the accused's history, the facts of the present offenses, and his personal interviews with the accused, Captain August's opinion was that the accused was suffering from a form of insanity known as schizophrenia and that at the time of these offenses he did not know right from wrong. The prosecution, in rebuttal, offered testimony from three psychiatrists to the effect that the accused was sane and that at the time of the offenses he did know right from wrong and could adhere to the right. Certain proceedings had in connection with the testimony given by the defense psychiatrist pose the first problem with which we must deal.

## II

As previously mentioned, Captain August, the psychiatrist who had examined the accused some time after the shooting, was called as a witness by the defense to support counsel's motion to dismiss the charges because of insanity. After discussing the personal history of the accused, the facts of the present offense, and the results of his personal interview with the accused, the Captain expressed the conclusion that at the time of the offense the accused was suffering from schizophrenia and was unable to know right from wrong. Following the direct examination, trial counsel launched into a rigorous cross-examination of the doctor in an attempt to render shaky his opinion. This effort was singularly unsuccessful. When the psychiatrist was later recalled as a court witness, trial counsel, again on cross-examination and again unsuccessfully, took a new approach by attempting to discredit Captain August's qualifications as an expert witness.

**263**

The manner in which trial counsel conducted his examination led one of the court-martial members to conclude that counsel was trying to humiliate Captain August, and the member expressed his dislike of such a procedure by asking several pointed questions of the witnesses who followed Captain August to the stand. Trial counsel then challenged Major Kelly, the member, for bias, and questioned him under oath. Despite defense counsel's objections, many on proper grounds, trial counsel questioned the member concerning the latter's opinion of Captain August's testimony on various other evidentiary matters. Although the court-martial member's testimony was generally favorable to the accused, when he was finally required to disclose his mental attitude toward the parties, he swore that he "might" be inclined to "bend over backwards" in favor of the prosecution, and that, "If it's a case of my being on the fence, if I were a 49–51, I believe the 51 would be in favor of the Government, rather than the accused." Although defense counsel stated he had no objection to the member, the court-martial voted to sustain the challenge. The accused contends here that the court-martial erred by this action, but we conclude it did not abuse its discretion in so doing.

Because of the vacilliating manner in which the member testified, it is impossible accurately to forecast whether he was biased against the accused or the Government. For that reason, we shall assume he meant what he said, and we will first develop the concept that his mind was closed against the accused. We take it as a basic premise that, "An accused has no right to jurors who believe him innocent." United States v. Dean, 5 USCMA 44, 50, 17 CMR 44, 50. Rather, as it was said in Neal v. United States, 22 F 2d 52, 53 (CA 4th Cir) (1927):

". . . The real inquiry was whether the jurors were unbiased and impartial; that is to say, whether they had or had not formed such fixed opinions as to the guilt of the accused that they would not be 'indifferent as they stood unsworn.' . . . If any of the jurors had formed

such a positive and decided opinion as to the merits of the case, that he was not an impartial juror, he was incompetent whether he had expressed that opinion or not."

Our inquiry is limited, then, to a determination of whether there is evidence to support a conclusion that the challenged court-martial member was not "indifferent as he stood unsworn." The problem here is one of discretion, that is, whether reasonable men could conclude the member was incompetent to serve. If so, no abuse of discretion is shown and this conviction may not be reversed on that ground. Neal v. United States, supra; State v. Greene, 74 RI 437, 60 A 2d 711, 714.

It is to be expected, of course, that all persons eligible to serve on courts-martial favor the enforcement of the criminal laws, and the degree of such a desire is not, in itself, a test of the members' qualifications. State v. Kelly, 70 Kan 98, 78 Pac 141 (1904). Nor is a juror disqualified because he abhors the particular crime charged more than others. State v. Marcus, 240 Iowa 116, 34 NW2d 179; Shank v. State, 189 Ark 243, 72 SW2d 519 (1934); Dies v. State, 56 Tex Crim 32, 117 SW 979 (1909). But when he becomes so partisan as to be unwilling to accord to an accused the presumption of innocence and the benefit of reasonable doubt, the member becomes disqualified for further service at the trial because of his bias. Carnaggio v. State, 143 Miss 694, 109 So 732 (1926). This conclusion follows, whether the court-martial member enters upon his duties with the view the defendant must prove himself innocent, State v. Vogan, 56 Kan 61, 42 Pac 352 (1895); or that "the accused must be guilty of something," United States v. Dean, supra; or with the notion that a defendant must establish the defense of insanity by overwhelming evidence, in a jurisdiction where the required quantum of proof is only a preponderance of the evidence, Jones v. State, 60 Tex Crim 139, 131 SW 572 (1910); or, as here, believing that doubts should be resolved in favor of the prosecution.

Here, Major Kelly, the challenged member, summed up his position by saying that if a ▮▮▮▮▮ ▮ close question was presented, he would resolve his doubts in favor of the Government. This concept, of course, does violence to all that we know of the principles of reasonable doubt and the presumption of innocence. Far from beginning his deliberations with the premise that an accused is innocent until proven guilty beyond a reasonable doubt, Major Kelly expounded, in essence, the theory that deliberations should be undertaken with the scales of justice weighted for the prosecution. Adherence to this erroneous precept is enough to justify the imputation of a forbidden bias to the member, and it adequately supports the action taken by the court-martial. True enough, other remarks made by Major Kelly, and acts done by him, would seem to permit the inference that he tended to favor the accused, rather than the Government. But the court-martial was entitled to accept his own words as an accurate statement of his true feelings, and act upon them. To put it in the words of Mr. Justice Minton, speaking as the organ of the Supreme Court in Dennis v. United States, 339 US 162, 171, 94 L ed 734, 742, 70 S Ct 519 (1950):

"... One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbaised [or biased] mind in a certain matter."

It may be true that further development of the issue would have shown the challenged member was willing to put aside his own beliefs and accept the law officer's instructions as to the presumption of innocence and the thesis of reasonable doubt, but this was not done. We must take the record as we find it, and when we do so, we discern sufficient evidence of bias toward the accused to sustain the court-martial's conclusion on the challenge.

Where we to conclude that the accused had a favorable member on the court, we would be required to consider the rights of the Government. Major Kelly, if some of his questions truly reflect his mental processes, was offended at the tactics employed by trial counsel. Acting accordingly, he seized upon the right of a court-martial member to ask questions as a means to build up the prestige of Captain August whom he believed had been unfairly belittled. Furthermore, he claimed to be interested in the principles of psychiatry and he sought to have some of the experts verify his beliefs which sounded favorable to the accused. While individually each question may not have been improper, the over-all questioning creates an impression that the member had departed from his character as an unbiased appraiser of facts to become a champion for the defense. While a court member is authorized ▮▮▮▮▮ ▮ to ask questions for clarification or to be better informed in doubtful areas, he is not permitted to take sides and become an advocate for either party. Once he openly leaves a nonpartisan role, he is subject to challenge for cause. It matters not which side he chooses, as both parties are entitled to an arbiter uninfluenced by anything but the facts and the credibility of the witnesses. Certainly, if the member in ▮▮▮▮▮ ▮ this instance was not unfair to the accused, contrary to his own assertion, then he was prejudiced against the Government, and his "49–51" answer was given to create the impression that, in spite of his apparent hostility to the prosecution, he ought not to be challenged by the Government because he would lean over backwards to give it favorable treatment. When the court-martial members were left with the choice of sustaining or overruling the challenge, they must have concluded that it was impossible for one party, or possibly both parties, to be judged fairly by a person who had exhibited hostility to the Government and yet expressed an opinion that the accused must carry the burden of establishing his innocence. Cast in that uncertain background, we are at a loss to understand how the court-martial

could reasonably have ruled other than to sustain the challenge, without casting doubt on the fairness of the proceedings.

We are not willing to accept appellate defense counsel's contention that it was error to sustain this challenge after defense counsel at trial stated that he had no objection to a continuation of Kelly's service as a member. Neither party has any right to the services of any particular juror; it is enough if all members of the court are impartial. The ultimate decision on a challenge must rest with the court-martial, Manual for Courts-Martial, United States, 1951, paragraph 62, page 89. While another court-martial might properly choose to rely upon the waiver offered by defense counsel, we cannot say this court-martial erred in failing to do so. Certainly out of it all, we are not prepared to say the court-martial abused its discretion in excusing the member.

One other matter bears mentioning. During the course of his examination of Major Kelly, the challenged member, trial counsel attempted on several occasions to elicit the Major's opinion as to the weight he attached to the qualifications of the various expert witnesses. Despite defense counsel's objection on proper grounds, the law officer permitted trial counsel to pursue this line of interrogation. In permitting this probing, the law officer erred.

In State v. Dillman, 183 Iowa 1147, 168 NW 204, 206 (1918), what we conceive to be the correct view was stated as follows:

". . . To test the qualification of persons called to sit as jurors neither party may inquire concerning his views of evidence to be adduced on the trial or the weight he would be inclined to attach thereto. These are matters on which the jurors are to act under the guidance of the court."

A party has no right to ascertain in advance what the jury may think of a proposed witness' credibility, State v. Everitt, 14 Wash 574, 45 Pac 150

(1896), and he is intruding into forbidden territory to inquire as to those matters during trial. It is natural to suppose that court-martial members form a tentative opinion as to the qualitative worth of evidence as it is received during the course of trial. Of course, members should not attempt to arrive at firm conclusions until after they have received instructional guidance from the law officer at the close of the case and retired to deliberate. But a process of preliminary evaluation, occurring during the course of trial, is inevitable and not subject to disclosure. If, then, counsel for either party challenges a member for cause during the course of trial, the law officer must make certain that no member is compelled to reveal his opinion as to the weight which he has tentatively assigned to the evidence already presented. We conclude, therefore, that the law officer was wrong in permitting trial counsel to probe into this untouchable area. However, our holding that the court-martial did not err in sustaining the challenge is not altered by the error found, for no prejudice to the accused can be ascertained from the improper interrogation. Although the questioning invaded a forbidden area, it also operated in a proper sphere and enough competent information was elicited to justify sustaining the challenge.

In State v. Thursby, 245 SW2d 859, 863, 864 (Mo) (1952), a very similar situation was presented. The following quotation illustrates our thinking here:

"Counsel for the state inquired at length asking the 24 veniremen, upon voir dire, concerning their views of the credence and weight to be given the testimony of a prostitute, and to the testimony of a procurer. The interrogation was objectionable because it tended to commit the jurors to an opinion, in advance of the trial, upon the credibility of the witnesses and weight of their testimony. It was tantamount to asking the jurors how they would decide the issues of the case before they had seen the witnesses upon the witness stand and heard them testify, and before they had heard the testimony of other witnesses relating to the facts and

266

circumstances of the case. State v. Gifford, Mo. Sup., 186 SW 1058; State v. McKeever, 339 Mo. 1066, 101 SW2d 22. However, defendant's counsel participated in this line of inquiry upon *voir dire* which inquiry did disclose that two jurors, Kraus and Brinton, were of the view that in no circumstances should any weight whatsoever be given to the testimony of a prostitute or of a procurer. Certainly it should not be said that the discharge of the veniremen, Kraus and Brinton, was an abuse of the trial court's discretion."

### III.

After the challenge of Major Kelly had been sustained, defense counsel moved for a mistrial, contending that it was impossible for the court-martial thereafter to accord the accused a fair trial because (1) the evidence had been discussed by the members in open court while the challenge of Major Kelly was being pursued; (2) the hearing on the challenge incidentally revealed that the members of the court had discussed the evidence "off the record"; (3) the trial counsel had deliberately delayed the making of his challenge against Major Kelly until just before the court-martial closed to deliberate; and (4) the accused was deprived of his numerical advantage on the court-martial by the sustaining of the challenge. It is now urged by appellate defense counsel that the law officer must have overruled the motion summarily, for this trial was had prior to our decision in United States v. Stringer, 5 USCMA 122, 17 CMR 122. Before that decision, military boards of review had held that such a motion was unknown in military law. United States v. May, 32 BR 183; United States v. Simpson, 4 CMR (AF) 256. Thus, counsel's conclusion here is that this law officer must have proceeded on the premise that he had no right to entertain the motion. It is true that in United States v. Stringer, supra, a decision rendered after the date of this trial, a majority of the Court concluded that a law officer in the military system does possess the power to declare a mistrial. It does not follow, however, that

the law officer did not consider the merits of this motion.

The first ground for the motion had been raised by an earlier objection and it had been overruled by the law officer. It is not urged that he did not consider its merits at that time. As to the second ground, Major Kelly in his testimony had stated that he heard a court-martial member say, during a recess and about a previous witness, that, "'He's a fine speaker.'" But Major Kelly expressly declined "to make [an] accusation" that the court "discussed evidence." It is apparent, then, that both the second and the third grounds for defense counsel's motion depended upon the presentation of evidence, and the fourth ground at least upon argument. The record reveals that an opportunity to support the motion was extended to counsel, for the following discussion took place:

"LAW OFFICER: Does the defense desire to present any evidence before—in support of this motion?

"ASST DC: No, sir, I think the evidence is already in.

"LAW OFFICER: Is there any desire to present evidence as to discussion of evidence by members of the court?

"ASST DC: Well, I think, sir, when Maj Kelly testified he presented such evidence. I don't see any particular need to reiterate it.

"LAW OFFICER: Is there any argument by prosecution or defense on the motion?

"TC: I merely wish to say, Colonel, as Lt Addis well knows that I am not clairvoyant; that I have no idea what Maj Kelly's pattern of conduct would be or what his answer would be to Lt Addis's question as to whether he would, as a result of my challenge, be in favor of the prosecution.

"LAW OFFICER: Is there any argument or discussion by the defense?

"ASST DC: No, sir, there is not.

"LAW OFFICER: The motion for a mistrial is denied. The trial will proceed."

More will be said later concerning the fourth ground for the motion, but enough is shown by the record to justify

our conclusion that the law officer denied the motion on its merits. This ruling lay within his discretion, and because the record supports his determination that the motion was not well taken, we are not at liberty to reverse it.

A substantially similar situation was before this Court in United States v. Gravitt, 5 USCMA 249, 17 CMR 249. In that case the accused moved for a change of venue. The motion was denied. On appeal, the accused contended, as does the accused here, that the motion was denied only because the law officer believed that such a motion was unknown in military law. Rejecting this argument, the Court said:

". . . It is argued that, long before the trial, an army board of review had held that a motion for a change of venue was unknown in the military; consequently, the law officer must have 'felt that he had no legal authority' to consider the motion. See United States v. Johns, 66 BR 169. Significantly, no mention was made of this board of review opinion in the argument on the motion. But assuming it was known to the law officer, a member of the Air Force, we find nothing in his comments to warrant a conclusion that he believed he had no legal power to consider the motion. On the contrary, the only reasonable construction of his remarks is that he was denying the motion on the merits. He plainly indicated he believed the reason advanced by the accused was insubstantial. It is equally plain he was willing to grant the motion if the accused could show good legal reason for his doing so. Therefore, we find no error."

As we have stated, the court-martial was warranted in sustaining the challenge for cause. Obviously, it turned out that the number of members required to vote "guilty" to reach such a finding was thereby reduced. Further, to impose a death sentence, all members must concur and the loss of one member might possibly reduce the accused's chances of escaping that supreme penalty. But the risk that the total number of court-martial members sitting for a particular case may be changed during the course of trial—for illness, essential transfer, after-discovered disqualification, and the like—is a consequence which the accused must take as a party to the trial. He has no absolute right to more than five members and if subsequent developments reduce legally the number of members sitting, an accused cannot complain judicially. In all events, we do not think this record required the law officer to declare a mistrial. His ruling was appropriate under all of the circumstances of the case.

Counsel for the accused also contend the cause should be reversed because of the misconduct of trial counsel. This was an inordinately brutal homicide, and undoubtedly counsel for the Government felt duty-bound to be aggressive and prosecute firmly. During the course of trial, he struck hard blows, but not unfair ones. Although we have examined the record with care, we cannot find any remarks made by him which were so clearly unfair as to warrant reversal, or even extended discussion. For a more complete statement of our view on this subject, see United States v. Valencia, 1 USCMA 415, 4 CMR 7.

IV

When the taking of testimony upon the question of insanity was complete, it became apparent to counsel for both sides that all the pertinent evidence on the merits had also been introduced. Consequently, defense counsel withdrew his motion for a finding of not guilty and entered a plea of not guilty. In addition, he asked that the question of insanity be decided together with the general issues in the case, and the prosecution and defense agreed that all the evidence before the court at that point should be considered on the merits. After an out-of-court discussion was held between the law officer and counsel on the proposed instructions, and after other necessary matters were disposed of, the law officer instructed the court-martial on the question of insanity at the time of the offense, among other subjects, but gave no instruction

on what effect mental derangement, short of total insanity, might have on the findings as to specific intent. In one of the assignments of error now before us, defense counsel contend this omission was contrary to military law and that it prejudiced the accused.

In United States v. Kunak, 5 USCMA 346, 17 CMR 346, we dealt with this same instructional problem. As in this case, that accused was charged with premeditated murder and his counsel introduced evidence to show that he was insane at the time of the offense. We there said:

"This brings us to an error which we conclude is fatal to the findings and sentence on premeditated murder. It involves the question of whether the law officer erred in failing to instruct the court-martial members that they might consider the mental deficiency of accused— short of insanity in the legal sense —in determining his capacity to premeditate. We have on several occasions mentioned the necessity of covering that issue by an appropriate instruction if it is raised reasonably by the evidence. One can hardly contend in this case that there was no substantial evidence of mental deficiency which might interfere with those mental processes. The instruction on premeditation is sketchy and while the one defining insanity informed the members of the court-martial that they could not convict the accused of the crime charged if there was a reasonable doubt about his mental responsibility, it is deficient, for the purpose under consideration, in that it was tied up to legal insanity which would exculpate the accused of the offense charged and all included offenses. The law officer nowhere suggested the important principle that mental impairment, less than legal insanity, might be considered by the court-martial members when they were deliberating upon the element of premeditation. Significantly, missing in this case is an instruction to the effect that if in the light of all evidence the court-martial has a reasonable doubt that

the accused was mentally capable of entertaining the premeditated design to kill involved in the offense of premeditated murder it could find the accused not guilty of that degree of the crime."

The facts of this case bring it squarely within the rationale of Kunak, supra, and cases cited therein. See also United States v. Smith, 5 USCMA 314, 17 CMR 314. Accordingly, we reach the conclusion that the finding of premeditated murder here cannot stand.

What we held in United States v. Kunak, supra, and United States v. Smith, supra, concerning the effect of partial mental impairment upon premeditation, we believe is also applicable to offenses involving a specific intent. We forecast a wider range of applicability in United States v. Holman, 3 USCMA 396, 12 CMR 152; and United States v. Higgins, 4 USCMA 143, 15 CMR 143, as well as in United States v. Kunak, supra, and United States v. Smith, supra, but the question has never earlier been squarely presented except with respect to premeditation.

We, therefore, hold that mental impairment, short of legal insanity, may affect the ability of an accused to entertain a specific intent. When, as here, such an issue is raised, the law officer errs who fails to instruct on this subject. Because a conviction of robbery requires a finding of the specific intent permanently to deprive the owner, or one having right to possession, of his property, it must be set aside. Lastly, the offense of assault with intent to commit murder requires not merely a general intent, but, rather, a specific intent to kill, United States v. Holman, supra, and hence is also affected by mental impairment short of that which wholly excuses. Accordingly, this conviction must also be reversed.

We note from the board of review's decision that it sought to differentiate this case from the principles announced in United States v. Kunak, and United States v. Smith, supra, by holding that "the evidence strongly indicates

that the accused was suffering from 'a defect of character, will power, or behavior,' and not from such a 'mental defect or disease' short of legal insanity as would have required the law officer to instruct the court-martial under the rule in United States v. Kunak." Part of the difficulty with that rationalization is that it entirely disregards the testimony of Captain August and the necessity of presenting such an issue to the court-martial in the right instructional posture. Under the state of the evidence at the trial, there was credible testimony which would have permitted the court-martial to find the accused not guilty by reason of insanity. Surely encompassed within that evidential framework was a basis for a finding that his mind was so impaired by a mental disease or defect that he did not have the capacity to premeditate or to form a specific intent to commit the other alleged crimes. When insanity is raised at trial, instructional deficiencies cannot be remedied by a reevaluation of the testimony at the appellate level. An accused is entitled, as a matter of right, to have an issue such as this submitted to the court-martial, under proper instructions, if it is raised reasonably by the evidence. Here Captain August's testimony is not unworthy of belief, other expert witnesses did not specifically exclude the possibility of a mental defect short of legal insanity affecting premeditation or specific intent, and we cannot gloss over the Captain's testimony by pretending it is too weak to raise an issue. Undesirable as it may be to either permit a reduction of offenses of this gravity, or to authorize a rehearing, we have no alternative other than to take that course when an accused has been denied a substantial right.

V

Numerous other errors have also been assigned by appellate defense counsel. We have considered them carefully, but nothing has been presented which would cause us to take any action other than the action which will be based on what has been said heretofore. If intoxication was raised reasonably by the testimony, an issue

**270**

we need not discuss, it could do no more than negate premeditation and specific intent. In that event, an instructional omission similar to the one found concerning mental impairment would demand the same disposition.

The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Army for reference to a board of review for reconsideration. The board may, if it chooses, affirm findings of unpremeditated murder, which does not involve a specific intent to kill, United States v. Craig, 2 USCMA 650, 10 CMR 148, and two offenses of assault with a dangerous weapon, United States v. McVey, 4 USCMA 167, 15 CMR 167, and affirm an appropriate sentence. United States v. Bigger, 2 USCMA 297, 8 CMR 97. In the event the board of review considers that action inadvisable, it may order a rehearing.

Chief Judge QUINN concurs.

BROSMAN, Judge (dissenting):

Of course, I agree with the majority that we cannot accept Carver's conviction of premeditated murder. However, I am troubled about several aspects of this singularly disorderly case, which—weighed together—push me to the conclusion that we should direct a rehearing, and must deny to the board of review the alternative of an affirmance of guilt of the lesser crime.

II

I also agree fully with the principal opinion's conclusion that error inheres in the manner in which the trial counsel interrogated Major Kelly respecting his beliefs and views. It will be remembered that a death case requires a unanimous vote of the court-martial's membership as to the sentence. Here the Government managed to secure the exclusion of one member who had appeared—not without minimal reason—to disapprove certain trial conduct of its lawyer in dealing with a defense witness—a point of view which might conceivably have redounded to the benefit of the accused.

Furthermore, insofar as Major Kel-

ly's attitudes are accurately reflected in the written pages of this record of trial—which I have examined with care— I find no indication of any sort of bias, or indeed of anything other than a highly commendable, if inartful, effort to insure fairness in the proceeding and to ascertain the facts. That this should result, however indirectly, in his exclusion from the court's membership—and at the Government's request—disturbs me greatly.

Major Kelly's confused and confusing remark having to do with "bending over backwards" in behalf of the Government may certainly be regarded as furnishing sound reason for a *defense* challenge for cause—and, so far as I can gather, this was the basis on which the remaining members of the court-martial sustained the challenge which was directed against him by trial counsel. However, the *accused's* lawyer did not at all choose to follow this tack— and thereby clearly indicated his willingness to assume whatever risk which might flow from the Major's retention within the tribunal's membership. We would be indulging in self-deception, therefore, if we were to place much reliance on the likelihood that the defense would have been harmed had Kelly remained. Most certainly I do not agree with my associates when they say that there was "sufficient evidence of bias *toward the accused.*" (Emphasis supplied.)

The real issue, it seems to me, is whether the member concerned was prejudiced *against the Government* because of his dislike for trial counsel's tactics. And there is probably another even more relevant and pointed question: Would his presence on the court have operated to cast "doubt on the fairness of the proceedings"? Cf. United States v. Stringer, 5 USCMA 122, 17 CMR 122.

Literally nothing said by Major Kel-

ly, either in his interrogation of witnesses or during his own extensive *voir dire* examination, reveals to me the possibility of prejudice on his part. I find little danger in his continued presence, therefore, unless it be thought—and for this there is a certain amount of support, logical and otherwise—that the manner in which trial counsel interrogated him would inevitably have served to arouse the ire of any man of spirit, with the result that such a one might be the less able to weigh a case's issues objectively. I suppose, though, that within the criterion of the Stringer test I cannot deny that it lay safely within the court's discretion to excuse the Major for the purpose of avoiding the untoward appearance created by the comment which indicated that he would "bend over backwards" for the Government in a close case.

However, I find myself bothered at this juncture by the circumstance that this remark was uttered in the course of a roving— a distinctly free-wheeling —interrogation believed by all of us to constitute error. Is a trial counsel to be permitted to question—at length and improperly—a court member whom he suspects he has estranged by his conduct of the hearing, and so to produce a situation in which the member must be excused if a bad public picture is to be avoided? I cannot bring myself to condone this sort of conduct by an affirmance of any sort here.

### III

And there is another matter. A majority of this Court held in the Stringer case, supra, that a motion for a mistrial must be included among those procedural devices available for use in military trials. My two associates, incidentally, made up this majority in Stringer; and for my own contrary position I relied *inter alia* on the circumstance that previously a motion for mistrial had been unknown—even rejected—in military law.[1] Of course, if

---

[1] It must not be understood that, despite my disagreement with the mistrial conclusion reached by my associates in the Stringer case, I am out of accord with their result *on functional*

grounds. Instead, I feel as strongly as they possibly can that the motion will serve fully as useful a purpose in military trials as it has long done in civilian proceedings—and, were I a legisla-

**271**

there is to be recognized a motion for mistrial under the Uniform Code, then I am sure that the accused in the case before us was entitled to the benefit of the law officer's exercise of discretion in passing on his motion—that is, in determining whether a new court-martial should have been assembled to pass on his case.

Whether Carver received this benefit, I am unable to determine from the record with assurance. Of course, the present case was tried long before the Stringer opinion was published, and it is quite possible that the law officer simply did not regard the motion as permissible, and thus did not reach the point of exercising his discretion in the matter. On the other hand, it is certainly arguable, as the principal opinion suggests, that the law officer's discretion was in fact exercised—and adversely to the accused.

It is clear, however, that the staff judge advocate to the convening authority did not accept the point of view of the Stringer case in this particular —for he said in his review of this record of trial that "[a] true motion for a mistrial may not be considered by the court," and cited United States v. Stevenson, 45 BR 267, 284. Not only does this observation indicate generally the ante-Stringer Service understanding of the law, but it suggests more specifically the climate of opinion on the point within the command in which the law officer in the instant case was functioning. The staff judge advocate's review further stated that "[a] motion for a mistrial may be treated as tantamount to a motion for a finding of not guilty," citing United States v. May, 32 BR 183, 194. And it continued by saying that, "If so considered here, it was, of course,

properly denied"—with which latter conclusion I am not at all out of sympathy. It would be most unfortunate, of course, if the law officer here *had* treated the mistrial motion as one for findings of not guilty and denied it as such—for it must be obvious that the criteria for action on the two motions are vastly different.

And it is not impossible that he did so, for he may well have shared the views on the subject held by Colonel Robert J. O'Connor, the staff judge advocate, in common with the generality of members of the military-legal community. The record reflects that, at the time of trial, the duty station of Lieutenant Colonel Willard J. Hodges, Jr., JAGC, the law officer in the present case, was the VII Corps headquarters, the command of the convening authority. And other data, which I am able to notice judicially, indicates that he was also the principal assistant to the staff judge advocate himself, his executive officer, in fact—and as such shared the latter's official quarters, perhaps even the same room. Naturally, all of this disquiets me as I consider the disposition of this case made by my brothers.

In any event, the law officer's conduct here can only be interpreted in one of two ways. (1) He may have felt that he possessed no power to grant a motion for a mistrial—and denied for that reason. (2) On the other hand, he may have considered the motion on its merits and decided against the movant. In either event he erred for my money. He was wrong under the first alternative because the accused was entitled to an exercise of judicial discretion on the merits. And he was wrong under the

tor, I would seek promptly to provide for it. Indeed, a case like the present one serves clearly to demonstrate the supreme utility of the device—or would have done so had the law officer acted appropriately.

In other words, I wholly approve of the use of the motion for mistrial in military practice in terms of a sound, fair and economical trial administration. In Stringer, however—and try as I would—I could not avoid the conclu-

sion that the Uniform Code forbade the course I preferred. And thus I found myself there in the rare and happy judicial situation of having had dearly held views thrust down my throat over my protests—and with no slightest personal responsibility for whatever error may have inhered in the determination. I can only wish that this joyous event had happened in appropriate cases in the past, and will recur if needs be with frequency!

272

second for the reasons set out in the preceding section of this opinion. In view of the regrettable posture of the record at the time the motion was before him, I am unable to avoid the conclusion that the law officer abused his discretion when he denied it.

## IV

The majority opinion fails to recite the remarks addressed by the trial counsel to one Captain August, a defense medical witness, and also those used in referring to him. If I recall these passages correctly, they included some quite colorful language and, as well, certain highly unflattering descriptions of the physician and his qualifications.

Recognizing fully that counsel is entitled to a broad latitude in the presentation of argument—including the privilege of commenting, within the limits of propriety, on the relative qualifications of witnesses—in the ordinary case I would not be distressed by expressions like those used by trial counsel in the case at bar. Here, however, I am afraid that they operate to lend real color to the defense claim of "overprosecution" and so form part of a pattern of conduct and events which leads me to favor the grant of a rehearing in this proceeding, which—it will be recalled—is both a doubtful and a death sentence case.

## V

I have only one possible quarrel with the treatment of insanity in the principal opinion. Judge Latimer adverts to the rationale used by the board of review in which its members—in passing on the necessity for a partial insanity instruction—sought to distinguish between "mental defect, disease, or derangement," on the one hand, and a "defect of character, will power or behavior," on the other.

As I read the Fisher case, the Supreme Court espoused no similar qualification when it considered the slightly misdescribed doctrine of partial insanity. Fisher v. United States, 328 US 463, 90 L ed 1382, 66 S Ct 1318. Indeed the Court indicated that under that principle—had it been recognized in the District of Columbia—Fisher would have been entitled to an instruction on partial insanity. Yet the accused there is revealed by the opinion of the Court to have been a "psychopathic personality," and neither a psychotic nor a psychoneurotic. Nor does anything exist either in Hopt v. People, 104 US 631, 26 L ed 873, the previous decisions of this Court, or the language of the Manual for Courts-Martial which serves to limit the defense in question to those mental ailments which would suffice in quality and nature to permit a finding of total insanity.

I say this is only a *possible* basis of disagreement with the principal opinion—for I am not entirely sure whether the organ of the Court approves the board's rationale, but holds it inapplicable to the situation before us, or whether he either rejects it or declines to pass on its correctness. Because of this uncertainty, I have wished to set out my own notions.

## VI

All in all, I would be much better satisfied if the Carver case were reheard. And so, I suspect, would the field law enforcement authorities of the service concerned—although perhaps for different reasons. The killing here was a particularly vicious one, and they appear to have thought with some reason that—unless the product of legal insanity—it warranted the supreme penalty. Of course, a death sentence may be reimposed following another trial.