UNITED STATES, Appellee

v

PAUL WALKER, Private First Class, U. S. Army, Appellant

7 USCMA 669, 23 CMR 133

No. 8837

Decided April 5, 1957

*First Lieutenant Bert M. Gross* argued the cause for Appellant, Accused. With him on the brief was *Major Edwin Doran.*

*First Lieutenant Edward S. Nelson* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *Captain Thomas J. Nichols.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

In this case, the convening authority ordered the alleged offense tried as non-capital, and the accused was convicted of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. He was sentenced to dishonorable discharge, total forfeitures, and life imprisonment. The convening authority approved only so much of the confinement as provided for a term of twenty years, and the board of review made a further reduction to ten years, both agencies other-

wise affirming the findings and sentence. Accused sought review here, and we granted his petition to decide whether the law officer erred in instructing the court.

The shooting of the victim in this case, one Ford, occurred on December 24, 1955, and it was the unfortunate culmination of a number of altercations among members of accused's company, in many of which Ford was a victorious participant. Chronologically, the events transpired as we relate them. As the accused was preparing to go on guard that Christmas evening, Ford approached and engaged him in a heated argument. During the quarrel, accused drew a pistol and ordered Ford away, but the deceased succeeded in wresting the pistol from him, knocked him to the ground, and administered a brutal beating, during the course of which he pistol-whipped, punched, kicked, and stomped the accused. The argument and fight together lasted perhaps ten or twenty minutes, and were witnessed by many bystanders, including a corporal of the guard, none of whom attempted to restore order. After the encounter was over, the accused, who had refused treatment of his injuries, was threatening to kill Ford. He was trembling, and appeared to be extremely angry and in intense pain—angrier and more upset, in fact, than any other person ever seen theretofore by an aidman of some three years' experience with injured persons. A short time thereafter, possibly fifteen to thirty minutes later, after having procured another pistol in addition to a carbine he had acquired, the accused was seen by the same aidman, of whom he inquired as to the deceased's whereabouts, and to whom he again announced his intent to kill Ford. There was evidence that he still appeared to be in pain, that he still trembled, and that he appeared to be as angry and emotionally upset as he was immediately after the fight. About a minute later, the accused shot and killed Ford, hitting him three times with rounds from both the pistol and the carbine. Prior to their fight, no enmity of any kind was known to have existed between the accused and the deceased.

At the trial, there was no issue raised as to whether the accused had killed Ford, nor was any excuse or justification presented. Rather, defense counsel sought to establish that when the accused killed Ford, he was acting because of extreme passion provoked by the fierce physical beating given him by the deceased shortly before the shooting, and hence that he was guilty at most of voluntary manslaughter. After both sides had rested, the law officer instructed, inter alia, that a finding of guilty of premeditated murder or a lesser included offense required the concurrence of two-thirds of the members of the court. He refused to instruct, despite defense counsel's request, that if passion in fact persisted at the time of the shooting, even though a reasonable cooling time had elapsed, accused was not guilty of premeditated murder. Appellate defense counsel contend that both of these actions by the law officer were erroneous, and that if either act contained error, the accused is entitled to a reversal of the findings and sentence.

With regard to the instruction given on voting, defense counsel argue that inasmuch as the convening authority had directed the case to be tried as noncapital, a finding of guilty of premeditated murder made a sentence of life imprisonment mandatory under the provisions of Article 118 of the Code, supra. They urge that the finding of guilty was tantamount to a sentence by the court to confinement for life, which sentence, under the provisions of Article 52(b)(2), Uniform Code of Military Justice, 10 USC § 852, requires a concurrence of three-fourths of the court members. They contend, therefore, that three-fourths of the members must concur to convict accused for an offense carrying a mandatory sentence of life imprisonment, and that the law officer should have so instructed the court.

As to the instruction refused, appellate defense counsel agree that if sufficient time elapsed between the provocation and the shooting for a reasonable person's passion to cool, then a reduction of the offense to voluntary manslaughter would not be required. They

argue, however, that passion also affects the capacity to premeditate, and that for this purpose the actual state of mind of the accused governs, whether or not a reasonable man's passion would have cooled, and, therefore, that in refusing to give the requested instruction, the law officer failed to place unpremeditated murder before the court in its proper context.

## II

We consider first, the propriety of the instruction the law officer gave as to the court's vote on guilt. Article 52 of the Code, supra, provides for voting upon findings and sentence as follows:

"(a) (1) No person may be convicted of an offense for which the death penalty is made mandatory by law, except by the concurrence of all the members of the court-martial present at the time the vote is taken.

"(2) No person may be convicted of any other offense, except by the concurrence of two-thirds of the members present at the time the vote is taken.

"(b) (1) No person may be sentenced to suffer death, except by the concurrence of all the members of the court-martial present at the time the vote is taken and for an offense in this chapter expressly made punishable by death.

"(2) No person may be sentenced to life imprisonment or to confinement for more than ten years, except by the concurrence of three-fourths of the members present at the time the vote is taken.

"(3) All other sentences shall be determined by the concurrence of two-thirds of the members present at the time the vote is taken."

These provisions of the Code are plain and clear, and set out the number of votes required to convict and to sentence under different subsections. This is appropriate, for findings and sentence are separate functions, a court-martial being unique in that the court members perform both. The vote on determination of guilt is taken at the close of the evidence and arguments, and that which fixes the sentence only in the event of a finding of guilty, and then after extenuating and mitigating circumstances and the previous record of the accused—matters normally inadmissible in determining guilt—are presented. Indeed, the unconnected nature of the two functions is further emphasized by paragraph 76b(2) •of the Manual for Courts-Martial, United States, 1951, wherein it is stated at page 124:

"It is the duty of each member to vote for a proper sentence for the offense or offenses of which the accused has been found guilty, without regard to his opinion or vote as to the guilt or innocence of the accused. Any sentence, even in a case where the punishment is mandatory, must have the concurrence of the required number of members."

Appellant does not claim he is entitled to acquittal unless there be a unanimous vote for guilt. He insists, however, that if a certain minimum sentence is mandatory upon conviction by a court-martial for a given offense, the determination of guilt must be by the same proportion of concurring votes as are required to impose that sentence. To lay down that rule would require us to rewrite the Uniform Code and military law, for not only does the present Code lack such a provision, but its predecessors, the Articles of War, have, since 1921 and throughout subsequent modifications, failed to so provide. For thirty-five years the plain and unambiguous statutes have prescribed a two-thirds vote to determine guilt for all offenses except wartime spying, while requiring a two-thirds, three-fourths, or unanimous vote to impose certain various sentences for those offenses.

Although this Court has never before been called upon to construe these sections of the Code, we are not without guideposts in this field, for Federal and military tribunals have often dealt with the question. In the following murder and rape cases—in all of which a sentence of life imprisonment was the man-

**673**

datory minimum under applicable law—conviction of the accused upon only a two-thirds vote of the court-martial members was upheld, notwithstanding that three-fourths or all were required to vote for the punishment meted out. Hurse v Caffey, 59 F Supp 363 (ND Tex) (1945); McDaniel v Hiatt, 78 F Supp 573 (MD Pa) (1948); Thompson v Sanford, 79 F Supp 584 (ND Ga) (1946); Brown v Hiatt, 81 F Supp 647 (ND Ga) (1948); Anderson v Hunter, 177 F2d 770 (CA10th Cir) (1949); United States v Hayes and Brown, 65 BR 373. Some civilian authorities have mentioned the possibility of inconsistency in the percentages of votes required, as illustrated by the case of Stout v Hancock, 146 F2d 741 (CA4th Cir) (1944), where the court said:

> "There is an apparent inconsistency in permitting a conviction on a two-thirds vote for a crime which must be punished by death or life imprisonment under article 92 and at the same time requiring a unanimous vote to impose the sentence of death and a three-fourths vote to impose the sentence of life imprisonment; but inconsistency is more apparent than real. Conviction and sentence are two separate steps in a court-martial proceeding (Winthrop's Military Law and Precedents, p 392); and, after conviction has been voted in a prosecution for murder or rape, the only punishments permissible under the law are death and life imprisonment. The vote on punishment, therefore, is but a choice between these two; and, unless there is a unanimous vote in favor of the death penalty, life imprisonment necessarily follows.

> . . . . .

> "In the case at bar, Hancock was both convicted of the crime charged and sentenced to life imprisonment by the votes of six of the eight members of the court-martial. This was conviction by more than two-thirds and sentence by three-fourths of the members of the court-martial, which is all that the law requires."

From the foregoing, it is clear that the civilian courts have interpreted the Federal statutes on voting in military courts-martial strictly according to their phraseology, even though the number of votes necessary to convict differs from the number required to impose a mandatory sentence, and even though inconsistency appears in the foreground in some cases. But it is to be remembered that the two statutes deal with separate and distinct acts of voting, and similarity in numbers or procedure is not compelled. Congress has the power to graduate the number of concurrences necessary to fix a sentence according to the severity of the punishment, and it did so, selecting unanimity for death sentences; seventy-five percent of the votes for sentences in excess of ten years; and sixty-six and two-thirds percent of the votes for sentences less than ten years. In addition, it was well within its legislative authority to require a different number of votes for findings of guilty where the offense was one for which the death penalty was mandatory. Merely because we might believe that consistent percentages would be desirable does not clothe us with power to change the statute to make them correspond. While criminal statutes covering the same general subject should be construed so as to make them harmonize, courts are not legislative bodies and that canon of statutory construction cannot be employed to construe an act contrary to a clearly expressed Congressional intent. Certainly the Code speaks loudly to the effect that Congress intended to fix different percentages for separate voting acts when it specifically provided that two-thirds of the members present must concur to convict of any offense except that for which the death penalty is mandatory, and that three-fourths must concur to determine a sentence less than death but more than ten years. Aside from an inconsistency in the limited field where a life sentence is the mandatory minimum upon conviction, which is more apparent than real, we are unable to find any reason to say Congress did not intend to prescribe the enumerated percentages. We cannot arbitrarily change the designated number of votes

necessary for either findings or sentence and, since Congress has provided that the concurring votes of two-thirds of the court-martial members is sufficient to convict an accused of an offense which demands confinement for life as the mandatory minimum sentence, the instruction by the law officer was correct.

### III

Next we turn our attention to the instruction sought by defense counsel. He requested, and the law officer refused to instruct:

"However, if you find that the passion caused by the provocation did in fact persist, even though by the standard of a reasonable man a sufficient cooling time had elapsed, then you should not find the accused guilty of premeditated murder."

The gist of this instruction is that the presence of any passion in the mind of the accused will prevent him from premeditating. That is not the law and hence the particular instruction was properly denied by the law officer, for even though the presence of passion may impair the capacity of an accused to premeditate, capacity is not necessarily totally impaired thereby. Rather, the fact of premeditation—and the capacity to do so—are questions for determination by the court under appropriate instructions. United States v Goodman, 1 USCMA 170, 2 CMR 76; United States v Gravitt, 5 USCMA 249, 17 CMR 249. We look, therefore, to the record to see if the instructions upon which the case was submitted to the court properly cover the issue.

The law officer instructed upon the elements of premeditated murder, and the lesser included offenses of unpremeditated murder and voluntary manslaughter. In doing so, he included the following language concerning provocation and passion:

". . . If, judged by the standard of a reasonable man, under all the circumstances developed in this case, sufficient cooling time elapses between the provocation and the kill-ing, the provocation will not reduce murder to voluntary manslaughter, even if the passion of the particular accused persists.

"Consequently, in order to find the accused guilty of murder in any form, you must be satisfied beyond a reasonable doubt that the alleged killing was *not* done in the heat of sudden passion caused by adequate provocation."

Appellate defense counsel do not dispute the correctness of this instruction. Indeed, they acknowledge that it sets forth the proper test for distinguishing between voluntary manslaughter and murder. They argue, however, that the term "murder," as contemplated by that language, may be either premeditated or unpremeditated, and that the above instruction gave the members of the court no standard upon which to determine the effect of any residual passion upon accused's actual state of mind. Defense counsel further argue that careful guidance of the court members was necessary in order that they might differentiate between the two degrees of murder, if sufficient cooling time had elapsed for a reasonable man, but passion had not, in fact, subsided. They conclude this facet of their argument by contending that the instruction given precluded the court members from considering the effect of continuing passion on the capacity of the accused to premeditate. That is to say, it set forth the principle that if the court-martial found the passage of time was sufficient to cool the passion of a reasonable man, the fact finders could not return any finding less than premeditated murder.

We are—indeed, have long been—of the opinion that the actual state of mind of the accused is the issue involved in premeditated murder, and, under the facts of this case, it follows that some instruction specifically informing the court-martial how to apply heat of passion to the element of premeditation should have been given. Good reason existed for the accused initially to become enraged, and we are sure that he should not have been convicted of premeditated murder if, at

the time of the killing, his mind was so befuddled by pain, rage, and passion that he did not premeditate, even though a reasonable man sooner would have collected his wits and thoughts and not have killed. Here we are dealing with a boy of nineteen years who, for the purposes of voluntary manslaughter, must be measured by the reasonable man yardstick, but who also must be measured by his own mental processes for the crime of premeditated murder.

We have held in numerous cases that where reasonably raised by the evidence, intoxication and mental impairment short of insanity must be considered by the court-martial, under appropriate instructions from the law officer, in determining the capacity of the accused to premeditate and the fact of premeditation. United States v Roman, 1 USCMA 244, 2 CMR 150; United States v Craig, 2 USCMA 650, 10 CMR 148; United States v Kunak, 5 USCMA 346, 17 CMR 346; United States v Covert, 6 USCMA 48, 19 CMR 174; United States v Carver, 6 USCMA 258, 19 CMR 384; United States v Dunnahoe, 6 USCMA 745, 21 CMR 67. In Kunak, supra, we quoted approvingly from Hopt v People, 104 US 631, 26 L ed 873 (1882) as follows:

"'. . . When a statute establishing different degrees of murder requires deliberate premeditation in order to constitute murder in the first degree, the question, whether the accused is in such a condition of mind, by reason of drunkenness *or otherwise,* as to be capable of deliberate premeditation, necessarily becomes a material subject of consideration by the jury.' [Italics supplied.]"

And in Dunnahoe, supra, we said:

". . . a person may not be found guilty of a deliberate and premeditated murder if, at the time when the homicide occurs, he is incapable, for any reason, of deliberating and premeditating." [Page 755.]

In that same opinion we approved, from Fisher v United States, 328 US 463, 66 S Ct 1318, 90 L ed 1382 (1946), the following dissenting remarks of Mr. Justice Murphy:

"'. . . When a man's life or liberty is at stake he should be adjudged according to his personal culpability . . . That elementary principle of justice is applied to those who kill while intoxicated or in the heat of passion; if such a condition destroys their deliberation and premeditation the jury may properly consider that fact and convict them of a lesser degree of murder.'"

From all of the foregoing, it is clear that if a mental condition might prevent premeditation, the court-martial must be advised to consider it when deliberating on the findings. In the case under consideration, the only instructions concerning passion were given in context with, and employed the test applicable to, the lesser included offense of voluntary manslaughter. That such did not enlighten the court-martial members on how to evaluate the factors which add to or detract from the capacity to premeditate is crystal clear from the letter of clemency signed by all ten members of the court-martial. They ranked from Colonel to Sergeant, and under their interpretation of the instruction they had no alternative but to find the accused guilty of premeditated murder, having determined that the passion of a reasonable man would have subsided prior to the killing. Before quoting from their letter, we pause to acknowledge the rule of law that triers of fact are not permitted to impeach their own verdict. However, we do not use the letter for that purpose, for we employ it only to demonstrate what we believe to have been the impact of incomplete instructions. This is the part of the letter we believe to be relevant:

"We do not in any way condone the unlawful taking of one man's life by another, but we believe that a murder committed under the facts as developed in this case does not warrant a lifetime of hard labor. Having made a finding that the accused was guilty of premeditated murder, we as court members were required to vote for a mandatory sentence of hard labor for life. This we had to do, but we believe that our duty would not

be complete were we not to recommend that clemency be exercised in this case. This belief is based upon the evidence that was presented during the court-martial which established that the motivation for the unlawful killing was a bruising, bullying beating of Walker by the victim of the shooting, Ford. As there was no evidence of 'bad-blood' between Walker and Ford prior to the beating, it is clear that it was the beating which in fact provoked Walker into shooting Ford. The fact that a 'reasonable man' would not have been provoked for such a long period of time precluded our making a finding of voluntary manslaughter. The mitigating effect of the evidence of the beating could not be considered by us in fixing a sentence, so we feel that it is especially appropriate that we submit this recommendation."

It is seldom that an appellate court is furnished with information concerning the impact on court-martial members of underdeveloped guidelines. But here we have proof positive that had an instruction been given as to the effect that any heat of passion actually present in the mind of the accused might have had upon his capacity to premeditate, a different finding probably would have resulted. No such instruction was given, nor was the court charged generally as to the factors to be considered in determining the issue of premeditation.

Government counsel argue that the instruction requested by defense counsel was not a correct statement of the law, and therefore that the law officer was not required to give it. Furthermore, a contention is advanced by the prosecution that the giving of any instruction of the sort requested would unduly emphasize certain bits of evidence and, therefore, would be improper. United States v Harris, 6 USCMA 736, 21 CMR 58. Neither assertion has substantial merit. Speaking of the last first, the suggested instruction would have outlined a defense theory. It would not have isolated bits of evidence and given undue importance to them. As to the first assertion, on numerous occasions we have held that even though a proposed instruction which improperly states the law need not be given by the law officer, he is not relieved of instructing on that subject when the request is sufficient to put him on notice that an instruction on the issue is essential to a proper disposition of the case. United States v Burden, 2 USCMA 547, 10 CMR 45; United States v Phillips, 3 USCMA 137, 11 CMR 137; United States v Desroe, 6 USCMA 681, 21 CMR 3. The requested instruction, though erroneous, outlined a defense theory whose nature could have been ascertained from its contents and from repeated references to it during trial. Accused's counsel consistently asserted that the reasonable man test should not be the measuring rod for accused's mental condition on the more serious crime of murder, as distinguished from the lesser offense of voluntary manslaughter, and so the law officer was not unfamiliar with a major theory relied on by the accused. Conceding that the instruction was inartfully and incorrectly worded, it was comprehensive and intelligent enough to charge the law officer with knowledge that some instruction upon the effect of passion on premeditation was necessary to guide the court. Moreover, there was evidence in the record raising reasonably that issue—indeed, the whole of the defense was based upon the theory that the accused killed Ford in the heat of passion.

In view of the foregoing, we hold that the law officer erred by failing to instruct upon the effect of passion on the capacity to premeditate. Because of this instructional infirmity, we reverse the findings and sentence, and return the record of trial to The Judge Advocate General of the Army for reference to a board of review for reconsideration. The board may affirm a finding of unpremeditated murder, and an appropriate sentence, or it may return the case for rehearing.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in part and dissenting in part):

The scales of Justice require exact

measure and for this reason I must disagree with the majority's disposition of this case. In appropriate cases error may be remedied by affirming lesser included offenses in accordance with the provisions of Article 59(b), Uniform Code of Military Justice, 10 USC § 859. The theory of this provision apparently is that in certain cases we balance administrative convenience against the interests of society—in having a court-martial determine the guilt of a crime and a proper sentence—and where the administrative problems are greater than the danger to society, we avoid the cost and bother by resolving the unknown in favor of the accused. Society generally is not bothered by this because the benefit inures to the accused. However handy this provision is in cases involving the lesser crimes, it seems strikingly inappropriate in a murder case. We agree that there was error in not instructing the court-martial on the effect of passion on ability to premeditate but I am not willing to resolve this question—which was not considered by the triers of fact—arbitrarily in favor of the accused. The accused has a right to have his criminality or lack of it determined by a court under proper instructions of law. The people also have an interest in the determination of the criminality of one of their members. They have a right to protection and a properly considered sentence. If sentences were merely retributive I might agree that society could not be harmed by the action considered here, but society imprisons its offenders for rehabilitation, and segregation from society is an essential part of this program.

The court might find that passion affected the accused's ability to premeditate. Properly advised they may reduce the degree of the crime and the sentence. The court-martial might find that he is guilty of murder as charged.

I also disagree with the use of the clemency petition in determining *post-factum* the mental processes of the court in their deliberations.

I would reverse the findings and sentence and return the case for a rehearing at the forum where the error was committed.